**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHAWN MUSGRAVE<br>185 Forest Avenue<br>Unit 4A<br>Palo Alto, CA  94301,<br><br>    Plaintiff,<br><br>    v.<br><br>MARK WARNER,<br>Chairman<br>U.S. Senate Select Committee on Intelligence<br>211 Hart Senate Office Building<br>Washington, DC  20510,<br><br>    and<br><br>U.S. SENATE SELECT COMMITTEE<br>ON INTELLIGENCE<br>211 Hart Senate Office Building<br>Washington, DC  20510,<br><br>    Defendants. | * * * * * * * * * * * * * * * * * * * * * * * * | Civil Action No. 1:21-cv-02198 |

**COMPLAINT**

Plaintiff Shawn Musgrave brings this action against Defendants Mark Warner and the U.S. Senate Select Committee on Intelligence pursuant to the common law right of access to public records, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.

**JURISDICTION**

1.    This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendants pursuant to 28 U.S.C. §§ 1331 and 1361.

## VENUE

2. Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Shawn Musgrave ("Musgrave") is a citizen of the United States and a resident of the State of California. As a freelance reporter whose work has been featured in *Politico*, the *Boston Globe*, the *Intercept*, and elsewhere, Musgrave is a representative of the news media.

4. Defendant Mark Warner ("Warner") is a United States Senator for the Commonwealth of Virginia. He currently serves as the Chairman of the U.S. Senate Select Committee on Intelligence ("SSCI") and is being sued in that capacity.

5. Defendant SSCI is a committee of the U.S. Senate.

6. Defendants Warner and SSCI are in possession and/or control of the record requested by Musgrave which are the subject of this action.

## BACKGROUND

### *PART I: THE COMMON LAW RIGHT OF ACCESS TO PUBLIC RECORDS*

7. "In 'the courts of this country'—including the federal courts—the common law bestows upon the public a right of access to public records and documents." The Supreme Court "was unequivocal in stating that there is a federal common law right of access 'to inspect and copy public records and documents.'"

8. All three branches of government are subject to this common law right, which "predates the Constitution itself" and is "fundamental to a democratic state."

9. As Judge Karen LeCraft Henderson noted in her concurrence in *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021), this common law right of access to public records

exists in some theoretical tension with constitutional provisions including the Speech or Debate Clause. Although Judge Henderson agreed that the right did not apply in that case because the Speech or Debate Clause outweighed Judicial Watch's right to access the records it sought, she noted that it is hardly clear that it would not apply to "the right case." According to Judge Henderson, the application of the common law right to access public records has long required "careful balancing," and *Judicial Watch* did not purport to preclude the right entirely.

10. Indeed, Judge Henderson noted that the D.C. Circuit has "never considered the Speech or Debate Clause's application to a common law right of access claim and the parties [in *Judicial Watch*] simply cite a single district court case where the two doctrines were raised." Moreover, as Judge Henderson explained, in that case—*Pentagen Technologies International v. Committee on Appropriations of the United States House of Representatives*, 20 F. Supp. 2d 41 (D.D.C. 1998)—Judge Kessler decided that the investigative reports at issue were protected from disclosure by the Speech or Debate Clause "only *after* determining that the [reports] were 'not 'public records'" as that term was construed by this Circuit's controlling precedent. The Speech or Debate Clause clearly did not provide "absolute protection from disclosure—including protection from a common law right of access claim"—because if it had, Judge Henderson argued, "the district court's 'public records' analysis would have been unnecessary."

11. Judge Henderson explained the proper framework for determining when this common law right of access applies. "First, a court must decide whether the document sought is a 'public record.'" If so, only then should the court "proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure."

12. Judge Henderson then explained what constitutes a "public record" subject to this common law right of access: "a government document created and kept for the purpose of

memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." The subpoenas at issue in *Judicial Watch* were public records, Judge Henderson explained, but the Committee's interest in keeping the documents secret outweighed Judicial Watch's interest in public disclosure.

13. "Nevertheless, the fundamental importance of the common law right of access to a democratic state . . . cautions against the categorical extension of Speech or Debate Clause immunity to the right." Judge Henderson explained that she only joined the judgment in that case because "Judicial Watch did not adequately present the argument resolving the Speech or Debate Clause and common law right of access doctrines *inter se*."

14. If a document is a "public record" under this framework, then, the Government's interest in keeping the document secret must be weighed against the public's interest in disclosure, and the Speech or Debate Clause may not be categorically invoked to preclude any request for such a public record.

15. After *Judicial Watch* was decided on 4 June 2021, Musgrave sent a request to SSCI for a copy of the full SSCI Torture Report ("Torture Report" or "Report"). As the Torture Report is undoubtedly "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived," and because the public interest in disclosure is high, Musgrave brings this action under the common law right of access to public records to compel the Report's disclosure. The following sections provide further background on the Torture Report itself and the efforts to keep an unredacted copy hidden from the public—and even from the rest of the Government.

4

### *PART II: THE TORTURE REPORT*

16. The Torture Report is officially titled Senate Report 113-288, *Report of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, and it was ordered to be printed on 9 December 2014 by Senator Dianne Feinstein, then-Chairman of SSCI. The Report is 6,700 pages long with 38,000 footnotes, although a redacted and heavily abridged version—containing a foreword, an Executive Summary, Findings and Conclusions, and Additional and Minority Views, and totaling about seven hundred pages—is available at

https://www.govinfo.gov/content/pkg/CRPT-113srpt288/pdf/CRPT-113srpt288.pdf.

17. The Torture Report's foreword—written by Sen. Feinstein—discusses the post-9/11 national security context within which the Central Intelligence Agency ("CIA") ran its detention and interrogation program, with Sen. Feinstein writing that "it is against that backdrop [of 9/11]—the largest attack against the American homeland in our history—that the events described in this report were undertaken. Nearly 13 years later, the Executive Summary and Findings and Conclusions of this report are being released. They are highly critical of the CIA's actions, and rightfully so. Reading them, it is easy to forget the context in which the program began—not that the context should serve as an excuse, but rather as a warning for the future."

18. The foreword continues: "[SSCI] . . . often pushes intelligence agencies to act quickly in response to threats and world events. Nevertheless, such pressure, fear, and expectation of further terrorist plots do not justify, temper, or excuse improper actions taken by individuals or organizations in the name of national security. The major lesson of this report is that regardless of the pressures and the need to act, the Intelligence Community's actions must always reflect who we are as a nation, and adhere to our laws and standards. It is precisely at

5

these times of national crisis that our government must be guided by the lessons of our history and subject decisions to internal and external review."

19. The foreword then summarizes the full Report's contents: "Instead, CIA personnel, aided by two outside contractors, decided to initiate a program of indefinite secret detention and the use of brutal interrogation techniques in violation of U.S. law, treaty obligations, and our values. This Committee Study documents the abuses and countless mistakes made between late 2001 and early 2009." Sen. Feinstein notes that, although "[t]he Executive Summary of the Study provides a significant amount of new information . . . to what has already been made public by the Bush and Obama Administrations, as well as non-governmental organizations and the press," the full Report is "more than ten times the length of the Executive Summary and includes comprehensive and excruciating detail." The Report "describes the history of the CIA's Detention and Interrogation program from its inception to its termination, including a review of each of the 119 known individuals who were held in CIA custody."

20. The full Torture Report "also provides substantially more detail than what is included in the Executive Summary on the CIA's justification and defense of its interrogation program on the basis that it was necessary and critical to the disruption of specific terrorist plots and the capture of specific terrorists." Although the Executive Summary "provides sufficient detail to demonstrate the inaccuracies of each of [the CIA's] claims, the information in the full Committee Study [i.e., the full Report] is far more extensive."

21. Sen. Feinstein chose not to seek declassification of the full Torture Report when it was released in part because doing so for the "more than six thousand page report would have significantly delayed the release of the Executive Summary. Decisions will be made later on the declassification and release of the full 6,700 page Study."

22. Sen. Feinstein concluded that "under any common meaning of the term, CIA detainees were tortured. I also believe that the conditions of confinement and the use of authorized and unauthorized interrogation and conditioning techniques were cruel, inhuman, and degrading. I believe the evidence of this is overwhelming and incontrovertible."

23. Sen. Feinstein wrote that the Torture Report should be used by "[t]his and future Administrations" to "guide future programs, correct past mistakes, increase oversight of CIA representations to policymakers, and ensure coercive interrogation practices are not used by our government again." Further, she called the full document "the most significant and comprehensive oversight report in [SSCI's] history, and perhaps in that of the U.S. Senate."

24. The beginning of the Findings and Conclusions section lists twenty topline conclusions which help provide further background about the final product. The following examples are representative of the nature of the rest of the topline conclusions:

- "#1: The CIA's use of its enhanced interrogation techniques was not an effective means of acquiring intelligence or gaining cooperation from detainees."

- "#2: The CIA's justifications for the use of its enhanced interrogation techniques rested on inaccurate claims of their effectiveness."

- "#3: The interrogations of CIA detainees were brutal and far worse than the CIA represented to policymakers and others."

- "#5: The CIA repeatedly provided inaccurate information to the Department of Justice, impeding a proper legal analysis of the CIA's Detention and Interrogation Program."

- "#6: The CIA has actively avoided or impeded congressional oversight of the program."

- "#7: The CIA impeded effective White House oversight and decision-making."

- "#17: The CIA rarely reprimanded or held personnel accountable for serious and significant violations, inappropriate activities, and systemic and individual management failures."

- "#20: The CIA's Detention and Interrogation Program damaged the United States' standing in the world, and resulted in other significant monetary and non-monetary costs."

### *PART III: LATER DEVELOPMENTS AND CONTINUED SECRECY*

25. When Sen. Feinstein and SSCI published the Torture Report in December 2014, it was distributed to the White House, the Director of National Intelligence, the Director of the CIA, the Attorney General, the Secretary of Defense, the Secretary of State, the Director of the Federal Bureau of Intelligence, and the CIA Inspector General ("IG").

26. In addition to copying those officials on the letter and transmission, Sen. Feinstein wrote to President Obama that to "ensure that such a program will not be contemplated by the United States ever again," and to "strengthen our resolve against torture . . . the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." "To achieve that result," she added, "I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees."

27. In January 2015, about a month after Sen. Feinstein and SSCI transmitted the Torture Report to the Senate and to the executive branch officials noted above, Senator Richard Burr became Chairman of SSCI. In one of his first moves as SSCI chair, on 14 January 2015, he

called for the White House and all agencies in the executive branch with copies of the full Torture Report to return them to SSCI. *See*, *e.g.*, Jason Leopold, *GOP Senator Wants to Make Sure the Full CIA Torture Report Never Sees the Light of Day*, VICE News (Jan. 21, 2015), *at* https://www.vice.com/en/article/a38mba/gop-senator-wants-to-make-sure-the-full-cia-torture-report-never-sees-the-light-of-day.

28. Sen. Burr's original request was not entirely successful for several reasons. First, the Obama Administration did not comply with Sen. Burr's request—President Obama instead ordered that the Report be preserved under the Presidential Records Act as part of his official presidential records. *See*, *e.g.*, Josh Gerstein, *Obama Won't Declassify Senate 'Torture Report' Now, But Will Preserve It*, POLITICO (Dec. 12, 2016), *at* https://www.politico.com/blogs/under-the-radar/2016/12/barack-obama-torture-report-declassify-preserve-232519. Second, and also in December 2016, Judge Royce Lamberth ordered that a full copy of the Report be both kept by the Department of Defense ("DOD") and deposited with this Court for secure storage as part of several habeas corpus cases related to Guantanamo Bay detainees.

29. Sen. Burr's request was largely successful, however. Several agency declarations were submitted to this Court on 21 January 2015 as part of a Freedom of Information Act lawsuit over the Report—*ACLU v. CIA*, No. 13-1870 (D.D.C.). In that case, the Government asserted that "[n]either [the Department of Justice] nor [the Department of State] . . . has even opened the package with the disc containing the full Report," and "CIA and DOD have carefully limited access to and made only very limited use of the Report." "Each agency has ensured that the envelope containing the disc is marked with the appropriate classification marking, stored in a secure location . . . and labeled as a 'congressional record.'" This was despite Sen. Feinstein's urging that the Report be read widely by cleared executive branch officials so the history of the

CIA's torture program is not forgotten and so "appropriate lessons can be learned from it," as she reiterated to President Obama in a second letter on 16 January 2015 when she was no longer Chairman.

30. In the summer of 2017, the Trump Administration returned the White House's copies of the Torture Report to Sen. Burr and SSCI. *See, e.g.*, Mark Mazzetti, Matthew Rosenberg, & Charlie Savage, *Trump Administration Returns Copies of Report on C.I.A. Torture to Congress*, N.Y. Times (June 2, 2017). The return of the Report "raise[d] the possibility that most of the copies could be locked in Senate vaults indefinitely or even destroyed—and increases the risk that future government officials, unable to read the report, will never learn its lessons."

31. Government officials have already apparently failed to learn the lessons of the Report. When Christopher Sharpley, then-Acting CIA IG, faced SSCI in a confirmation hearing on 17 October 2017 to be the CIA Inspector General, the following exchange occurred after Sharpley stated that it was his decision alone to return the Report to SSCI at Sen. Burr's demand:

> Sen. Ron Wyden (D-Ore.) was not impressed: "If your office and the committee are going to be erasing historical records because somebody down the road is unhappy with them," he said, "our country is going to need a lot of erasers." Wyden worried aloud about the precedent Sharpley's decision set, and was so exasperated by the nominee's refusal to acknowledge as much that he spontaneously announced his intention to vote "no" from the dais. Sen. Martin Heinrich (D-N.M.) followed up by pointing out that the report includes chapters dealing specifically with the IG's office, then asked Sharpley if he at least "consider[ed] reading the report before returning [it]…so you could do your job more effectively?" "No, I did not," Sharpley replied. He conceded that he could have done so, but "chose not to." Ranking Member Dianne Feinstein (D-Calif.) took a moment to remind Sharpley of the obvious: "The point of distributing [the report] to the departments was in the hope they would read it, not look at it as some poison document, and learn from it."

Scott Roehm, *Congress is Facing Decisions on Torture, and Needs to Treat Them As Such*, Just Security (Nov. 10, 2017) (alterations in original), *at* https://www.justsecurity.org/46924/congress-facing-decisions-torture-treat/.

32. As a result of Sen. Burr's push to recall the Torture Report to SSCI, coupled with the Trump Administration's cooperation with his demands, there are few entities with remaining copies of the Report. A federal district court and the Department of Defense only have their copies pursuant to Judge Lamberth's order mentioned above, and the National Archives and Records Administration only has a copy as part of President Obama's official presidential archive. Thus, unless it comes from SSCI, the earliest date at which the Report is likely to become subject to public declassification requests would be when President Obama's records collection becomes subject to such requests in 2029, since President Obama has already stated that he would seek to keep the Report confidential for the maximum legal duration.

33. The damage of the Report's continued secrecy is already being done as more and more high-level officials are not only not required to read the Report but could not read it even if they wanted to. Indeed, CIA officials clearly did not read the Report when it was released—or at least, they testified to that end to a federal court—and CIA officials cannot read it now because they no longer have a copy of the report about how their own agency illegally tortured detainees and then misled Congress, the White House, the Department of Justice, and the public about it.

34. Meanwhile, the American public has only ever had access to the redacted and heavily abridged Executive Summary version, despite Sen. Feinstein's wishes when she and SSCI transmitted the Report that it would eventually be declassified. The "overwhelming and incontrovertible" evidence in the document Sen. Feinstein deemed "the most significant and comprehensive oversight report in [SSCI's] history, and perhaps in that of the U.S. Senate" is

virtually memory-holed for at least another eight years if not longer. It is time that this critical piece of American history is made public.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (WARNER/SSCI – PUBLIC RECORDS DENIAL)

35. Musgrave repeats and realleges the allegations contained in all paragraphs set forth above.

36. On 4 June 2021, Musgrave submitted to SSCI a request for a copy of the full Torture Report.

37. SSCI has not provided the Torture Report as of the filing of this lawsuit.

38. Musgrave has a legal right under the common law right of access to public records to obtain the Torture Report because it is a "public record" within the relevant framework, it does not implicate the Speech or Debate Clause rights of any individual Member of Congress or Committee to a meaningful extent, and SSCI's interest in keeping it secret is outweighed by the uniquely significant public interest in disclosure of the full Report.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shawn Musgrave prays that this Court:

(1) Order Defendants Warner and SSCI to provide the Torture Report to him;

(2) Declare that the common law right of access applies to committees of the U.S. Senate, and direct the Secretary of the Senate to develop a standardized process for the handling of such requests;

(3) Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

      (4)      Award reasonable costs and attorneys' fees as provided in 28 U.S.C. § 2412(d) or any other applicable law;

      (5)      Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

      (6)      Grant such other relief as the Court may deem just and proper.

Date:   August 18, 2021

                                                     Respectfully submitted,

                                                     /s/ Kelly B. McClanahan
                                                   Kelly B. McClanahan, Esq.
                                                   D.C. Bar #984704
                                                 National Security Counselors
                                                 4702 Levada Terrace
                                                 Rockville, MD 20853
                                                 301-728-5908
                                                 240-681-2189 fax
                                                 Kel@NationalSecurityLaw.org

                                                 *Counsel for Plaintiff*