### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHAWN MUSGRAVE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-02198 (BAH) |
| | * | |
| MARK WARNER, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Shawn Musgrave ("Musgrave") commenced this litigation pursuant to the common law right of access to public records and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, to obtain a copy of Senate Report 113-288, entitled *Report of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program* ("Torture Report" or "the Report"). On 19 October 2021, Defendants U.S. Senator Mark Warner and the Senate Select Committee on Intelligence (collectively "SSCI") filed a Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated herein, the Court should deny SSCI's Motion and grant Musgrave's Cross-Motion for Summary Judgment, which seeks a declaratory judgment that the common law right of access applies to reports written by Committees of the U.S. Congress in appropriate circumstances.

### ARGUMENT

This case will hinge on two main questions: (1) Does sovereign immunity bar a lawsuit under the common law right of access against Members or committees of the U.S. Congress; and

(2) Does the common law right of access apply to Committee reports in general or to the Torture Report in particular.[1] While the Court may consider these questions to be close calls, based on the record before the Court, it is not possible to state that Musgrave's claims are *implausible* simply because the Court might rule against him. The Court should accordingly deny SSCI's motion and explicitly hold that if SSCI wishes to receive a ruling that the Torture Report is not subject to the common law right of access, it must do so through a summary judgment motion supported by evidence. Alternatively, the Court should authorize limited discovery into the Torture Report to determine the plausibility of Musgrave's claims.

## I.    SSCI'S SOVEREIGN IMMUNITY ARGUMENT HAS BEEN REJECTED OR IGNORED EVERY TIME A CONGRESSIONAL DEFENDANT HAS RAISED IT

SSCI expressly acknowledges that this Court, following *Washington Legal Foundation v. U.S. Sentencing Commission*, 89 F.3d 897 (D.C. Cir. 1996) [hereinafter *WLF II*], recently found the so-called *Larson-Dugan* exception[2] applicable to a congressional committee and its chairman under the common law right of access to public records. (SSCI's Mem. at 16 (citing *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 311-14 (D.D.C. 2020) [hereinafter *Schiff I*], *aff'd on other grounds*, 998 F.3d 989 (D.C. Cir. 2021) [hereinafter *Schiff II*.]) However, SSCI then attempts to relitigate this already-settled question by asserting that either a statutory or constitutional violation must be identified for the *Larson-Dugan* exception to apply. (*Id.* at 16-17.) As a result, SSCI argues, sovereign immunity applies and the Court lacks jurisdiction to hear this case. (*Id.*) Put another way, SSCI "'respectfully disagrees with this Court's' interpretation of

---

[1] SSCI splits this second question into two parts (Defs.' Mem. of P. & A. Supp. Defs.' Mot. Dismiss, Dkt. #5-1, at 8-13, 19-28 (filed Oct. 19, 2021) [hereinafter SSCI's Mem.]), but they will be treated together herein. Accordingly, Musgrave will also address the sovereign immunity argument first, even though SSCI treated it second (*id.* at 13-19), for ease of reading.

[2] This exception is named after two cases: *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682 (1949), and *Dugan v. Rank*, 372 U.S. 609 (1963).

the [*Larson-Dugan* exception]," *Nat'l Sec. Counselors v. CIA*, No. 12-284, 2016 U.S. Dist. LEXIS 157063, at *75 (D.D.C. Nov. 14, 2016), which this Court has previously declined to recognize as a valid reason for the Court to change its mind. *See id.* at *75-80; *see also Nat'l Sec. Counselors v. CIA*, 206 F. Supp. 3d 241, 264 (D.D.C. 2016) (criticizing defendant for "continu[ing] to press an argument squarely rejected in this Court's earlier decision").

However, because SSCI has raised the argument, Musgrave must respond to it substantively, which he will endeavor to do as succinctly as possible. The same points as SSCI raises here were raised and rejected in turn there. First, the defendants argued that the Mandamus Statute does not waive sovereign immunity by itself. *Schiff I* at 312. "True enough," the Court wrote, "but that assertion merely begs the question" because if the *Larson-Dugan* exception should apply, then it is "well-settled that '[n]o separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity.'" *Id.* (quoting *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005), and citing *WLF II* and *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996)). Second, the defendants argued that there is no clear, non-discretionary duty to act and that Plaintiff must demonstrate a statutory or constitutional violation in order for the exception to apply, rather than just violation of a common law right. *Schiff I* at 312-14. The Court found that this argument, too, "misses the mark" because any exercise of discretion available to the committee or its chairman (with a majority vote of committee members, etc.) would necessarily be "cabined accordingly by the legal duty or obligation to fulfill plaintiff's request" if the common law right applies. *Id.* The Court properly found, in virtually the same relevant circumstances as the instant case, that *WLF II* constitutes binding precedent to the effect that the duty created by the common law right fulfills the mandamus jurisdiction prong of the plaintiff having a "clear right to relief" and the defendant

having a "clear duty to act." *Id.* As a result, *WLF II* requires merging this jurisdictional question with the merits of whether the common law right applies to the documents sought. *Id.*

In fact, the undersigned has discovered that even though this argument—that the sovereign immunity question does not merge with the merits—has been asserted by Congressional defendants almost every time someone has sued them recently for records, *no court* has never accepted the argument. In fact, the Congressional defendants in both *Schwartz v. DOJ*, 435 F. Supp. 1203 (D.D.C. 1977)—which first found that "the general rule is that all three branches of government . . . are subject to the common law right" and which held that "Congress is subject to the common law rule which guarantees the public a right to inspect and copy public records," *id.* at 1203—and *Pentagen Technologies International Ltd. v. Committee on Appropriations, U.S. House of Representatives*, 20 F. Supp. 2d 41 (D.D.C. 1998)—which first mentioned this aspect of *Schwartz, id.* at 44—noticeably failed to even *mention* sovereign immunity, despite the fact that both of them post-dated *Dugan* by more than a decade. (*See* Ex. A *passim* (*Schwartz* defendants' briefs); *see also* Ex. B *passim* (*Pentagen Technologies* defendant's briefs). This is particularly noteworthy given the extraordinary amount of time the defendants in the latter case spent attempting to convince Judge Kessler that she should not follow *Schwartz* (*id.* at 12-17, 29-31), when it would have been logical to argue that *Schwartz* was wrongly decided *because sovereign immunity applied*. Yet by the time Judicial Watch filed a lawsuit against Chairman Schiff in 2019, Congressional counsel had determined that sovereign immunity so clearly applied that it deserved to be raised even in the face of a thorough, well-reasoned opinion expressly rejecting it. Given this Court's prior rulings, the Court should simply follow what it has done before by rejecting this sovereign immunity argument and moving on.

Furthermore, SSCI's specific argument in this case offers nothing new to the existing analysis. It merely attempts to reopen this question by arguing, just as the *Schiff I* defendants did, that because no constitutional or statutory violation was identified, sovereign immunity must apply. (SSCI's Mem. at 16-19.) The only novel argument offered is a citation to *Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64, 81 (D.D.C. 2021), which discusses mandamus and what kind of duty may give rise to its availability. (SSCI's Mem. at 18.) That case, as SSCI explains, found that the kind of "duty" required by the *Larson-Dugan* framework did not arise from the Architect of the Capitol's human resources manual. SSCI analogizes that case to this one, asserting that a common law right violation is not a "statutory" violation in the same way that a human resources manual violation is not. (*Id.* at 18-19.)

Even if *Schiff I* and *WLF II* did not already establish that the sovereign immunity question merges with the merits of the common law request, this analogy does not make any sense. A human resources manual is an internal document establishing internal rules and guidance. Unless provided otherwise, such a manual does not purport to have any external binding legal effect, such as giving rise to a duty that may be enforced in court. Contrarily, the common law right of access to public records is a centuries-old common law right that— *inherently*—may *only ever* be asserted (1) against the Government and (2) in court (if the requested documents are not made available for inspection and copying, of course). It *necessarily* creates an enforceable governmental duty—upon a document request, of course—by the right's very existence. If the right does not create a duty, or if sovereign immunity is not implicitly waived by its existence, the common law right widely recognized across this country would be meaningless and unenforceable. *Maynard* does not change the mandamus calculus here whatsoever, and it does not deal with or discuss records or this common law right whatsoever.

Because the federal jurisprudence regarding this common law right is so limited, it may be helpful to consider how the right works—and whether sovereign immunity is ever asserted—at the state level.  In fact, sovereign immunity is almost never litigated at the state level because of how firmly so many states have embraced the right over time. Texas courts, for example, have held for over a century that the very broad common law right exists. *See Palacios v. Corbett*, 172 S.W. 777, 778 (Tex. Civ. App. 1915); *Tobin v. Knaggs*, 107 S.W.2d 677 (Tex. Civ. App. 1937) (finding mandamus against county clerk the proper tool for vindicating plaintiff's right to copy county's financial records). The Vermont Supreme Court noted in *Doe v. Salmon*, 135 Vt. 443, 445-46 (1977) that "[a]s a correlative to the right of inspection of public records and documents, the custodian of those records has a legal duty to the public to accord that right. This duty is ministerial and so clear and specific that no element of discretion or of official judgment is involved in its performance." Sovereign immunity is generally not discussed in these cases—whether because it is not raised or because the court ignores it—presumably because this common law right is always treated as such a fundamental duty owed, exclusively by government actors, to the public.

More state-level details are included in the below section regarding displacement, but the key takeaway here is that sovereign immunity hardly features at all in state-level jurisprudence regarding this common law right, presumably because the nature of the right itself is considered an implicit waiver of sovereign immunity. Indeed, the undersigned could not find even one state-level case where this sovereign immunity question was litigated, even though one would surely expect this argument to be ubiquitous if it had any validity. Although what state courts do in this arena is of course not binding on this Court, the fact that this argument appears—let alone

succeeds—virtually nowhere else in case law regarding this common law right in other jurisdictions in this country is telling, and this Court should not hesitate to reject the argument.

## II.   THE COMMON LAW RIGHT OF ACCESS APPLIES TO CONGRESSIONAL COMMITTEE REPORTS

Before addressing whether or not the common law right of access applies to the Torture Report, it is first necessary to address the broader question of whether the common law right of access can *never* apply to a Congressional Committee report, either because it has been precluded by or through the Journal and Rulemaking Clauses of the U.S. Constitution (SSCI's Mem. at 20-25) or because such reports are inherently protected by the Speech or Debate Clause of the U.S. Constitution (*id.* at 8-13).

### A.   THE COMMON LAW RIGHT HAS NOT BEEN DISPLACED

SSCI asserts that the Journal and Rulemaking Clauses of the Constitution, U.S. Const. art. I, § 5, cls. 2-3, and the internal Senate Rules displace or otherwise nullify the common law right. (SSCI's Mem. at 21-24.) First, it is a stretch to argue that either of these clauses is a basis for Congress to be able to effectively unilaterally override any other rules, laws, or rights regarding Congressional records of any kind. These clauses are being asserted as a constitutional anchor for the concept that Congress's own internal rules have a legally binding preclusive effect, and this argument should be met with skepticism from the outset.

For example, Justice Story's definitive Constitutional treatise stated:

The object of the whole [Journal] clause is to insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents. And it is founded in sound policy and deep political foresight. . . . So long as known and open responsibility is valuable as a check or an incentive among the representatives of a free people, so long a journal of their proceedings and their votes, published in the face of the world, will continue to enjoy public favor and be demanded by public opinion.

7

1 J. Story, Commentaries on the Constitution of the United States § 840 (4th ed. 1873). The goal was *transparency*, and the secrecy part cited by SSCI is the *exception*, not the rule. The idea that that exception should entirely displace the common law right of access is contrary to the Clause's own purpose. In fact, Justice Story even explicitly explained that the Constitutional privileges afforded to Congress should be viewed through a common law lens: "We may resort to the common law to aid us in interpreting such instruments and their powers, for that law is the common rule by which all our legislation is interpreted. It is known and acted upon and revered by the people. It furnishes principles equally for civil and criminal justice, for public privileges and private rights." *Id.* § 846. Most relevantly, when he wrote this, he was discussing "*all* the powers and privileges expressly vested in each house of congress by the constitution" as well as "[w]hat further powers and privileges they incidentally possess." *Id.* § 845 (emphasis added). This Court should take this analysis to heart when considering any of SSCI's arguments that amount to "but it's *just common law*." (*See*, *e.g.*, SSCI's Mem. at 13 n.5 ("Such balancing is particularly ill-suited as the Speech or Debate Clause is a constitutional privilege and the right asserted by plaintiff is based in common law.").)

The Rulemaking Clause, meanwhile, simply states that each house can determine its own rules for its proceedings. It says nothing about transparency, nothing about the rules being *externally* binding or having any external legal effect, and nothing about displacement. It is telling that the only cases SSCI cites on this point deal with the Federal Rules of Criminal Procedure. (*Id.* at 24.) It is universally recognized that those Rules are binding—they have been promulgated by the Supreme Court *pursuant to a statute*, the Rules Enabling Act, 28 U.S.C. § 2072, which was passed by both houses of Congress and signed by the President.

More directly, however, to argue that internal Congressional rules can displace an otherwise-valid common law right misunderstands how displacement works, both generally and as applied to the freedom of information arena. The following sections address, first, how Congressional displacement must work generally and why Senate rules cannot displace the common law right; second, why other sources, such as the Freedom of Information Act ("FOIA"), also do not displace the right; and third, how various states have addressed the coexistence of their freedom of information laws and the common law right.

1.  **Congressional Displacement Must Be Statutory, Intentional, Specific, Bicameral, and Consistent with the Presentment Clause, so Senate Rules Cannot Displace a Common Law Right.**

Congress does have the power to abrogate common law rights if it so chooses—but there must be a statutory purpose to that end. In *United States v. Texas*, 507 U.S. 529 (1993), the Supreme Court noted its "longstanding . . . principle that 'statutes which invade the common law . . . are to be read with a presumption favoring the retention of [common-law rights], except when a statutory purpose to the contrary is evident.' *Id.* at 534 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). When legislating in an area with existing common law rights, "Congress does not write upon a clean slate . . . [i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Texas* at 534 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).

It is also abundantly clear that a statute, passed by both houses of Congress and either signed by the President or passed over a veto, is the only valid method by which Congress may abrogate such a common law right, and that therefore, internal congressional rules or policies have no power to accomplish the same end. In *INS v. Chadha*, 462 U.S. 919, 955-57 (1983), the Supreme Court ruled that any exercise of Congress's legislative power must conform to the

standards prescribed in Article I of the Constitution—namely, bicameral agreement, presentment

to the President, and the possibility of a veto and congressional override thereof. The *Chadha*

Court noted the few and narrow Constitutional exceptions in Article I that allow one house of

Congress to act unilaterally: the House initiating impeachments, the Senate conducting

impeachment trials, the Senate considering Presidential appointments, and the Senate ratifying

treaties. *Id.* "Clearly, when the Draftsmen sought to confer special powers on one House,

independent of the other House, or of the President, they did so in explicit, unambiguous terms."

*Id.* Importantly, the *Chadha* Court also addressed the internal rulemaking power of the houses of

Congress:

> One might also include another "exception" to the rule that congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses. Each House has the power to act alone in determining specified internal matters. Art. I, § 7, cls. 2, 3, and § 5, cl. 2. However, this 'exception' *only empowers Congress to bind itself* and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in *any legally binding manner* outside a closely circumscribed legislative arena, except in specific and enumerated instances.

*Id.* at 955 n.21 (emphasis added).

This discussion by a 7-2 Supreme Court hardly comports with SSCI's assertion that the

Journal and Rulemaking Clauses, combined with the Senate Rules, have any legally significant

effect of immunizing the Senate from the common law right. Aside from the exceptions noted in

*Chadha*, Congress simply cannot exercise unilateral legislative power without complying with

all these requirements. And there cannot be a "statutory purpose to the contrary" here that would

abrogate the common law right, as required by *Texas*, 507 U.S. 529, because there is no statute at

all. As the District Court aptly noted in *Schwartz*, Congress—despite having the means to do so

"readily at its disposal"—has not passed a law either exempting itself from the common law

right or clarifying procedures for its application to the legislative branch, so Congress remains

subject to the right. 435 F. Supp. at 1204. As the Senate Rules themselves clearly cannot displace the common law right, and Congress has not specifically provided otherwise in a statute, the right must apply to Congress.

### 2.    FOIA Also Does Not Displace the Common Law Right as Applied to the Legislative Branch.

Next, although SSCI has not advanced this argument, it is also worth addressing FOIA here and whether that statute could displace the right, in order to more fully show what *would* be required for Congress to get around its current obligation to comply with the common law right.

FOIA, 5 U.S.C. § 552, may arguably preempt the common law right as applied to the *executive* branch because FOIA arguably "speaks directly" to public records access for that branch, even if it did not purport to remove any existing common law rights. However, it does not purport to comment on—let alone abrogate—this existing common law right of access outside the executive branch. *See* Joseph Regalia, *The Common Law Right to Information*, 18 Rich. J. L. & Pub. Int. 89, 121-25 (2015) (discussing how the few federal courts to have considered whether the common law right still applies to executive branch agencies covered by FOIA have found the right preempted as applied to those agencies, especially when the information sought is covered by a FOIA exemption) [hereinafter Regalia]. In other words, although the common law right has been effectively foreclosed in federal cases where the information sought is covered by FOIA, there is no good reason why the right should not still apply to the legislative branch despite having largely been forgotten in the midst of FOIA and analogous state laws. *See id.* at 131-32 ("[W]here individuals need information from the legislative or judicial branch the common law right remains a robust option.").

This conclusion makes even more sense considering the vitality of the same common law right as applied to the judiciary. Indeed, the same right has been applied repeatedly to federal

judicial records in this Circuit for decades, with a "strong presumption" in favor of disclosure once a document is deemed a "judicial record." *See*, *e.g.*, *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) (recognizing the common law right of access to judicial records and establishing factors for considering exceptions); *CNN, Inc. v. FBI*, 984 F.3d 114, 118 (D.C. Cir. 2021) (discussing the "competing interests" that may allow withholding, pursuant to the *Hubbard* factors, despite the presumption of disclosure); *Leopold v. United States*, 963 F.3d 1121 (D.C. Cir. 2020). In fact, under a different name—"the right to inspect and to require copies of public documents and judicial records"—the right was upheld by this Circuit over a century ago. *Ex parte Drawbaugh*, 2 App. D.C. 404 (D.C. Cir. 1894). The *Drawbaugh* court examined the history of the right and stated that "in the United States, no regulation of this kind is known to have been expressly made; and any limitation of the right to a copy of a judicial record or paper . . . would probably be deemed repugnant to the genius of American institutions." *Id.* at 406-07.

Because FOIA did not displace the judicial version of this same right—as the common law right to judicial records has thrived for many years—there is accordingly little reason to believe that FOIA would displace the right as to the legislative branch. But the important point here is that if FOIA *did* speak regarding the legislative branch in some way, it could potentially displace the common law right because it would be a statute that would meet all the *other* Constitutional requirements discussed above. But for this case, given the District Court's acknowledgement in *Schwartz* that the same common law right of access applies to all three branches of government, there is especially no basis for any argument that *internal rules of one house of Congress*, rather than a statute complying with *all* the displacement requirements, can abrogate the right.

3.      **Many States Recognize and Have Long Upheld the Coexistence of Both the Common Law Right and State Freedom of Information Statutes.**

As final context for this discussion, it may be helpful to consider how states have handled the coexistence of these two methods of obtaining public records, statutes and the common law right. Texas, as a prime example, did not need to worry about whether its Texas Public Information Act ("TPIA") displaced any common law right because the law codified the right broadly, including its application to the legislature. *See* Texas Gov't Code Ann. §§ 552.001-.353. The Texas legislature is both subject to the TPIA, *see, e.g.*, "Texas Public Information Act," Texas House of Representatives, available at https://house.texas.gov/help/website-policies/texas-public-information-act/ (providing instructions for making a TPIA request from either a House member, committee, or administrative department) (last accessed Mar. 18, 2022), *and* it enjoys Debate Clause immunity under the Texas Constitution. Tex. Const., Art. 3, § 21 ("No member shall be questioned in any other place for words spoken in debate in either House.").

Although Texas is a good example of the coexistence of these transparency tools, it is far from alone. The states have generally either: (1) explicitly adopted the common law right in their constitutions or open records laws, as Texas has done; (2) treated the common law right as bolstering the open records law's liberal construction or a records request's viability; or (3) maintained them as separate but equally viable methods of obtaining records. New Hampshire adopted its broad Right to Know into its state constitution, *see* N.H. Const. Part I, Art. 8. New Jersey's legislature, in adopting its Open Public Records Act ("OPRA"), "expressly and unambiguously declared that the common law right of access remained a viable and legally independent means for a citizen to obtain public information." *Bergen Cty. Imp. Auth. v. N. Jersey Media Grp., Inc.*, 370 N.J. Super. 504, 516 (N.J. Super. Ct. App. Div. 2004); *see* N.J. Stat.

Ann. § 47:1A-1, 1A-8. California's Supreme Court confirmed that the common law right does still apply where the state's open records law does not already apply. *Sander v. State Bar of Cal.*, 58 Cal. 4th 300, 323 (2013) (holding that the common law right applies to the State Bar, affirming appellate finding that the "broader common law right of access [] applies to all three branches of government"). Vermont's Supreme Court has also stated that the state's open records statute does not limit the common law right of access. *Herald Ass'n v. Dean*, 174 Vt. 350 (2002) (finding that the common law right's breadth is reflected in the statute's liberal construction).

The list goes on and on. *See*, *e.g.*, Regalia at 127 (collecting cases along these lines from New York, Washington, West Virginia, Wisconsin, and New Jersey); *see also id.* at 129 (discussing how in, *e.g.*, Alabama or Arkansas, because the open records statutes are limited, "the common law right remains essential"); *id.* at 130 (discussing the "many cases and legislative declarations stating that the common law and state FOIA statutes were meant to work in tandem"). The one outlier the undersigned was able to find was Pennsylvania, in which the state Supreme Court found that the state's open records statute—by not covering or mentioning the state's legislature at all—implicitly displaced the common law right. *Uniontown Newspapers, Inc. v. Roberts*, 576 Pa. 231 (2003).

The approaches of the majority of these states carry a few important lessons. First, the common law right is indeed widely respected and recognized all across this country, as has been the case for many years. Second, most states continue to either maintain the right as a separate method of pursuing government records, or they have *expressly* absorbed the right into liberal open records statutes or even state constitutions. Third, as shown by Texas, it is indeed possible to subject a legislature to the open records process while still protecting its—and the legislators'—interest in secrecy under some circumstances, including via a Debate Clause. These

principles do not have to be mutually exclusive. Given that the common law right has not been displaced as applied to the federal legislative branch, and that the right has successfully and often proudly been applied to the legislatures of many states for the same reasons, this Court should find that the common law right applies to Congress and therefore to SSCI.

### B.   COMMITTEE REPORTS ARE NOT INHERENTLY PROTECTED BY THE SPEECH OR DEBATE CLAUSE

The core dispute of this litigation is effectively over the question of whether Committee reports are inherently protected by the Speech or Debate Clause of the Constitution, U.S. Const. art. I, § 6, cl. 1. Judge Henderson's concluding remarks succinctly explain the cost of ruling in SSCI's favor:

> Nevertheless, the fundamental importance of the common law right of access to a democratic state—a right "predat[ing] the Constitution itself"—cautions against the categorical extension of Speech or Debate Clause immunity to the right. *Mitchell*, 551 F.2d at 1260. Simply put, the Speech or Debate Clause should not bar disclosure of public records subject to the common law right of access in all circumstances. Instead, the Clause should be considered in weighing the interests for and against disclosure as part of the second-step balancing test. "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to." *Reps. Comm. for Freedom of the Press*, 489 U.S. at 772-73 (emphasis in original) (quoting *EPA v. Mink*, 410 U.S. 73, 105, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973) (Douglas, J., dissenting)).

*See Schiff II* at 999 (Henderson, J., concurring). Because the plaintiff-appellants in that case did not fully argue this point, the Circuit did not adjudicate it, leading to the uncertain posture in this case.

The main question before the Court in *this* section is whether it agrees or disagrees with Judge Henderson's second sentence quoted above: "Simply put, the Speech or Debate Clause should not bar disclosure of public records subject to the common law right of access *in all circumstances*." (*Id.* (emphasis added).) However, despite SSCI's focus on the "absolute" nature

of the Speech or Debate Clause privilege (SSCI's Mem. at 9-10), the Court need not concern itself with that particular straw man, because Musgrave is not challenging the assertion. Whether the Speech or Debate Clause conveys an absolute or qualified privilege once its protection attaches is beyond the scope of this argument, because Committee reports are not all inherently covered by the Speech or Debate Clause in the first place.

As an initial matter, Musgrave concedes—as he must—that SSCI correctly states that "the Supreme Court has specifically and consistently found committee reports to be within the protection of the Speech or Debate Clause." (*Id*. at 11 (citing *Hutchinson v Proxmire*, 443 U.S. 111, 124-25 (1979), and *Gravel v. United States*, 408 U.S. 606, 624 (1972).).) However, the context for those cases paints a significantly different picture than SSCI describes, ultimately providing more support for Musgrave's case than for SSCI's.

Simply put, those cases—as well as the related case *Doe v. McMillan*, 412 U.S. 306 (1973)—only discussed Committee reports as the medium in which an objectionable statement was recorded. They stood for the simple principle that defaming a person in a Committee report was no different than defaming a person in a floor speech as far as liability was concerned. They did *not* stand for the principle for which SSCI cites them here, to say that a house of Congress cannot be compelled to release a Committee report if it would be considered a public record according to the common law right of access. In fact, as SSCI acknowledges, Judge Lamberth ordered a copy of the Torture Report to be deposited with the District Court in connection with pending Guantanamo Bay litigation (SSCI's Mem. at 6), which he would not have been able to do if the Speech or Debate Clause prevented Congress from being forced to release a Committee report to an entity to which it had not consented to release it.

Whether or not a particular Committee report is protected from compelled disclosure by the Speech or Debate Clause, therefore, is a fact-dependent inquiry. In *Gravel*, the Court explained, in the context of republication, that the republication "was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence." 408 U.S. at 625. Filtering the instant controversy through the *Gravel* filter, Speech or Debate Clause immunity is triggered when: (1) the information is essential to Congressional deliberations; and (2) revealing the information would threaten Congressional integrity or independence by impermissibly exposing its deliberations to executive influence. This framework is bolstered by the Court's explanation that "the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.'" *Id.* (quoting *United States v. Doe*, 455 F.2d 753, 760 (1st Cir. 1972)).

When viewed this way, it becomes obvious that not all Committee reports would satisfy this test. While many—if not most—Committee reports are deliberative in nature, some are not. Some Committee reports are in effect ends unto themselves, where the writing of the report describing what was learned during the investigation is the end goal. This is especially true when copies of the reports are disseminated to the Executive Branch,[3] since further dissemination could hardly "expose [the Committee's] deliberations to executive influence." *Gravel*, 408 U.S. at 625. While information about *how* the Committee wrote the report would arguably still be protected by the Speech or Debate Clause, the report *itself* would not.

---

[3] Additionally, there is an argument to be made that disseminating a report outside Congress triggers the republication exception, especially if it is disseminated to the subject of the report. At that point, Congress has effectively forfeited the ability to claim that it kept the report confidential.

Accordingly, for the reasons identified above, the Court should grant Musgrave's cross-motion and issue a declaratory judgment that the common law right of access applies to reports written by Committees of the U.S. Congress in appropriate circumstances.

## III.   THE COMMON LAW RIGHT OF ACCESS APPLIES TO THE TORTURE REPORT

In order to find that Musgrave is entitled to a copy of the Torture Report under the common law right of access, the Court needs to find that: (1) it is a public record; (2) it is not covered by the Speech or Debate Clause; and (3) the public interest in its release outweighs the Government's interest in keeping it secret. The Torture Report clearly satisfies all three of these prongs.

First, the Torture Report is clearly a public record. This Circuit has defined "public record" as "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *WLF II* at 905. The definition excludes "the preliminary materials upon which an official relied in making a decision or other writings incidental to the decision itself," *id.* at 906, but since all Musgrave is seeking is the final report—and not even the original draft of the report, which was updated after conversations with the Central Intelligence Agency ("CIA") (SSCI's Mem. at 5)—that exclusion is not in play. In fact, this prong is so obviously satisfied that SSCI has not even argued that the Torture Report is *not* a public record. Given that, in the context of a motion to dismiss under Rule 12(b)(6), all reasonable inferences must be drawn in the non-movant's favor, *Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997), the Court should easily conclude that this prong has been satisfied.

Regarding the second prong—which admittedly is not part of the *WLF II* framework due to its exclusive applicability to Congress—the Torture Report does not satisfy the test for Speech

or Debate Clause protection. As noted above, it was clearly disseminated to the Executive Branch, and while Chairman Burr did engage in active efforts to reclaim all the copies, he never once argued that it was because the Report was privileged. Moreover, as former Senator John D. Rockefeller, IV, informed the Circuit, SSCI in 2014 "never intended to limit the CIA's or other agencies' power to disseminate and utilize the *final*, full Report sent to the Executive Branch by then-Chairman Dianne Feinstein." Br. of *Amicus Curiae* Sen. John D. Rockefeller IV Supp. Appellants, Dkt. #1585072, at 6 (filed Nov. 23, 2015) [hereinafter Rockefeller Br.], *ACLU v. CIA*, No. 15-5183 (D.C. Cir.) (attached as Ex. C). Sen. Rockefeller further clarified that, contrary to SSCI's implications, SSCI in 2014 "never wished to shield the full Report – with appropriate redactions – from the public eye." *Id.* at 8-9 (claiming that "the district court erred when it assumed that publication of the Report's Executive Summary, rather than the full Report, implied that the Senator and his colleagues intended for the more complete document to forever remain secret").

Lastly, Sen. Rockefeller explained that Sen. Feinstein's letter to President Obama transmitting the Report "indicated that the SSCI did not intend to maintain control over the document." *Id.* at 10. These statements clearly show that the purpose of the Torture Report was not deliberative in nature, but that it was instead intended to be "use[d] as broadly as appropriate to help make sure that this experience is never repeated." *Id.* at 11.[4] Simply put, while Senator Burr's actions may have reasserted Congressional control over the Torture Report for *FOIA*

---

[4] While this *amicus curiae* brief is not a sworn declaration, it does frequently cite to the Congressional Record and other sources, including the Torture Report itself, and the Court should take judicial notice of a statement filed at the behest of a well-respected former Senator who can be considered a "source[] whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), unless SSCI presents evidence suggesting that Senator Rockefeller's claims are false.

purposes, they cannot change the actual purpose of the Report at the time it was written and transmitted, which is the critical criterion for Speech or Debate Clause purposes.

The last prong, that of balancing the public's interest in disclosure against the Government's interest in secrecy, is far more nuanced in this case than SSCI implies. Contrary to SSCI's description, Musgrave does not seek to "compel SSCI and its Chairman, Senator Mark Warner, to disclose to him *the full classified Report*." (SSCI's Mem. at 1 (emphasis added).) Musgrave simply seeks to compel SSCI to disclose to him *the releasable portions* of the full Report. Like Senator Rockefeller, Musgrave concedes that there are likely "appropriate redactions" which should be made before the Report can safely be released publicly. In pursuing this litigation, Musgrave is simply attempting to compel such a declassification review, which, upon information and belief, SSCI to date has been unwilling to undertake or request that the Executive Branch undertake. Given SSCI's aggressive argument that there is no interest in public disclosure of the classified Torture Report because the Executive Summary and the Findings and Conclusions have been released (*id.* at 27-28), it is apparent that, absent a court order, SSCI will be unlikely to voluntarily reverse its position any time soon.

However, the mere fact that the Executive Summary and the Findings and Conclusions *have* been declassified and released demonstrates that the full Report contains reasonably segregable unclassified information, and even knowing the percentage of text that remains classified after such already-declassified information has been unredacted would be a significant improvement in the public's understanding of this Report. Simply put, at the absolute least Musgrave is entitled under the common law right of access to a redacted copy of the full Report, which would allow him to challenge the redactions directly, either in this litigation or through another process, such as Mandatory Declassification Review, *see* Exec. Order 13,526 § 3.5.

## IV.   THE COURT SHOULD AUTHORIZE LIMITED DISCOVERY OR CONDUCT A HEARING AS AN ALTERNATIVE TO DISMISSAL

As noted above, Musgrave admits that some of these issues may be close calls, and that SSCI may be able to introduce case-specific evidence supporting its case. That admission does not mean that Musgrave has failed to plausibly allege that he should prevail. With that in mind, however, the Court may choose to authorize limited discovery to ascertain the relevant facts and support or refute the plausibility of Musgrave's claims, and Musgrave respectfully encourages the Court to do so. The Court could also hold a preliminary hearing to adduce relevant evidence.

If the Court wishes to order formal written discovery or deposition testimony, Federal Rule of Civil Procedure 26(b)(1) states: "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). If the Court simply wishes to allow examination of an SSCI official, Rule 12(i) allows a Court to use a preliminary hearing "to determine jurisdictional as well as other threshold issues." *Kregler v. City of N.Y.*, 608 F. Supp. 2d 465, 475 (S.D.N.Y. 2009). As explained in *Kregler*:

> [A]cknowledging that this case presents a close call, to minimize additional motion practice at this stage and avert potentially unnecessary extensive discovery, the Court proposes two steps intended to achieve the "amplication" of factual allegations by means of a "flesh[ing] out" procedure such as that suggested in *Iqbal*. 490 F.3d at 158. First, the Court will exercise its discretion pursuant to Rule 12(i) to schedule a preliminary hearing at which the parties may present the testimony of live witnesses and other evidence limited to Defendants' objections to the pleadings, specifically the threshold legal issues upon which, under the *Twombly* and *Iqbal* plausibility test, the sufficiency of Kregler's . . . claim is grounded. . . . As regards matters involving factual issues that bear on the subject of the hearing the Court may consider affidavits, depositions or documents, or testimony presented orally.

*Id. See also Rivera-Gomez v. de Castro*, 900 F.2d 1, 2 (1st Cir. 1990) (noting that Rule 12(i) "can be an excellent device for conserving time, expense, and scarce judicial resources by targeting early resolution of threshold issues"). Such a procedure would allow the undersigned to question

an SSCI official under oath in the Court's presence, which would ideally adduce the information the Court will need to make its ruling.

Regardless of which approach the Court selects, SSCI's failure to proffer definitive evidence on any issues in controversy, coupled with the fact that the relevant evidence on this issue rests solely with the Government, means that Musgrave should be given the opportunity to obtain and adduce relevant evidence without imposing an onerous discovery burden on SSCI. This is especially appropriate since the evidence sought would be limited to information about the purpose of the Torture Report and the exchanges SSCI had with the Executive Branch about it, which would not be considered privileged material subject to the Speech or Debate Clause.

Discovery on these topics can be accomplished in part through the use of interrogatories, document requests, and requests for admissions. In the final analysis, however, Musgrave would likely need to conduct targeted depositions of individuals who can speak with personal knowledge. Documents, while certainly probative, do not address sufficiently how SSCI actually acted during the relevant time periods.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied or, alternatively, the Court should authorize limited discovery, and Plaintiff's Cross-Motion for Partial Summary Judgment should be granted.

Date:   March 20, 2022

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853

301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*