

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PENTAGEN TECHNOLOGIES
   INTERNATIONAL LTD., et al.,      )

          Plaintiffs,

    v.               Case No. 1:98cv00047 (GK)

COMMITTEE ON APPROPRIATIONS
   OF THE U.S. HOUSE OF
   REPRESENTATIVES, et al.,

          Defendants.

FILED

MAR 1 6 1998

**DEFENDANTS' MOTION TO DISMISS**

Pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, defendants

Committee on Appropriations of the U.S. House of Representatives ("Committee"), and the

Honorable Bob Livingston, the Representative of Louisiana's 11th congressional district and

Chairman of the Committee, through counsel, respectfully move for an order dismissing the

Complaint in this matter with prejudice.  A proposed order is attached and oral argument is not

requested.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**Introduction**

Pursuant to a supposed "common law right of access to public records," plaintiffs

Pentagen Technologies and Russell Varnado seek in this action to obtain access to certain non-

public, confidential reports prepared for internal Committee use by the Committee's investigative

staff (the Surveys and Investigations Staff).  Specifically, plaintiffs seek to review and copy all

Ex. B

investigative staff reports prepared after June 1993 that relate to the Department of Defense's Sustaining Base Information Services ("SBIS") program. Complaint at 7 (Jan. 9, 1998).[1] The investigative staff prepared the reports in question to aid the Committee in carrying out its legislative responsibility to recommend appropriate funding levels for the program.

It is unclear for what precise purpose plaintiffs seek the investigative staff reports, although the Complaint suggests that plaintiff Pentagen Technologies, an English software company, intends to use the documents in connection with U.S. ex rel. Pentagen Technologies International, et al. v. CACI International, et al., No. 96 Civ 7827 (S.D.N.Y.), a False Claims Act case against several defense contractors. See Complaint at ¶ 16. In this respect, plaintiffs' lawsuit is the functional equivalent of a subpoena duces tecum. Plaintiff Varnado is not identified in the Complaint other than as a resident of Fort Washington, Maryland. Id. at ¶ 3.[2]

### Factual Background

The House Appropriations Committee is charged, among other things, with "[a]ppropriati[ng] . . . revenue for the support of the Government." Rule X.1(b)(1), Rules of the

---

[1]   SBIS is a U.S. Army program designed to create a "comprehensive national automated information system." H.R. Conf. Rep. 104-863, at 913 (1996). See also U.S. v. CACI International, Inc., 953 F. Supp. 74, 75 (S.D.N.Y. 1995) (SBIS intended "to modernize [U.S. Army] installation information management systems"). For the convenience of the Court, copies of the pertinent pages of H.R. Conf. Rep. 104-863 and other House reports and documents referred to in this memorandum are attached collectively as Exhibit A.

[2]   According to press reports, Mr. Varnado "managed information technology acquisition for the Army Material Command until 1992." W. Wayt Gibbs, Battling the Enemy Within, Scientific American, April 1996, at 35. He is also, apparently, a plaintiff in the False Claims Act case.

House of Representatives (105th Cong.) (referred to hereafter as "House Rules").[3]  "[T]o assist it in the determination of matters within its jurisdiction," the Committee is vested with authority to "conduct such studies and examinations of the organization and operation of executive departments and other executive agencies . . . as it may deem necessary."  House Rule X.2(b)(3).[4] See also  2 U.S.C. § 72a(b) (authorizing House and Senate Appropriations Committees to retain professional staff to conduct studies and examinations of matters within their jurisdictions).  The Surveys and Investigations Staff is the professional investigative staff that performs this function for the House Appropriations Committee.

Section 8 of the Committee's rules addresses the procedure applicable to studies and examinations conducted pursuant to House Rule X.2(b)(3) and 2 U.S.C. § 72a(b).  A request for such a study or examination is initiated by a majority vote of a subcommittee, with the approval of the Chairman and Ranking Minority Member of the full Committee or, alternatively, by a majority vote of the full Committee.  Section 8(b), Rules of the House Committee on Appropriations (105th Cong.).[5]  Section 8 goes on to provide, in pertinent part, that

> [a]ny information obtained by such staff [appointed to conduct the study or examination] shall be reported to the chairman of the subcommittee requesting such study and examination and to the Chairman and Ranking Minority Member, shall be made available

---

[3]     For the convenience of the Court, copies of the pertinent parts of Rule X and other House and Committee rules referred to in this memorandum are attached collectively as Exhibit B.

[4]     The authority set forth in Rule X.2(b)(3) was first given to the Committee in 1943, and  incorporated into the rules of the House in 1953.  See Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. 104-272, 104th Cong., 2d Sess. 428 (1997).

[5]     In practice, the Chairman and Ranking Member of the full Committee, as well as the Chairman and Ranking Member of the pertinent Subcommittee, must sign off on a directive to the investigative staff to initiate a study or examination.

> to the members of the subcommittee concerned, and *shall not be*
> *released for publication until the subcommittee so determines.*

Section 8(d), Rules of the House Committee on Appropriations (105th Cong.) (emphasis added).

Investigative staff reports are rarely, if ever, disseminated publicly, either in whole or in part. Many of the reports contain classified or proprietary information, and they are specifically intended for internal use, that is "to assist [the Committee] in reaching decisions on specific funding levels" for the projects and activities studied. H.R. Rep. 104-870, at 12 (1996). Sometimes, although not often, information from investigative staff reports may be extracted and used in other Committee-prepared reports in accordance with Committee Rules. See id. at 14 ("[I]nformation may be released for publication only when the Subcommittee so determines as provided by Section 8 of the Committee's rules.").

In this case, pursuant to Section 8, the Committee's Subcommittee on Defense (now the Subcommittee on National Security) ("Subcommittee") first asked the investigative staff in or about 1994 to study the SBIS program. Between 1994 and 1996, the investigative staff compiled several reports that addressed the SBIS program (among other things). As noted above, none of these investigative staff reports have been made public. On several occasions and in connection with various appropriations bills, the Committee issued public reports — to which plaintiffs have full access — that discuss the SBIS program.[6] Plaintiffs' attorney requested that the Committee provide him with copies of the investigative staff reports, but the Committee declined.

---

[6]     See, e.g., H.R. Rep. No. 105-206, at 155 (1997); H.R. Rep. No. 104-863, at 913-14 (1996); H.R. Rep. No. 104-617, at 143 (1996); H.R. Rep. No. 103-562, at 57-58 (1994). See also H.R. Rep. 105-132, at 51 (1997) (report of House Committee on National Security).

**Argument**

I.   Plaintiffs' Claim Is Barred by the Speech or Debate Clause of the Constitution.

As an initial matter, plaintiffs' claim against the Committee and Chairman Livingston for access to investigative staff reports is barred by the Speech or Debate Clause of the Constitution. U.S. Const., art. I, § 6, cl. 1 ("for any Speech or Debate in either House, they [the Representatives and Senators] shall not be questioned in any other place.").

The protections of the Speech or Debate Clause apply to all activities

> within the "legislative sphere". . . even though the[] conduct, if
> performed in other than legislative contexts, would in itself be
> unconstitutional or otherwise contrary to criminal or civil statutes.

Doe v. McMillan, 412 U.S. 306, 312-13 (1973) (quoting Gravel v. U.S., 408 U.S. 606, 624-25 (1972)).  The "legislative sphere" includes all activities that are

> "an integral part of the deliberative and communicative processes
> by which Members participate in committee and House
> proceedings with respect to the consideration and passage or
> rejection of proposed legislation or with respect to other matters
> which the Constitution places within the jurisdiction of either
> House."

Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504 (1975) (quoting Gravel, 408 U.S. at 625).[7]  Moreover, the Speech or Debate Clause "applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself."  Gravel, 408 U.S. at 618.

Below, we first describe the history, purpose and scope of the Speech or Debate Clause,

---

[7]     See also Kilbourn v. Thompson, 103 U.S. 168, 204 (1881) (Speech or Debate immunity extends to any act "generally done in a session of the House by one of its members in relation to the business before it.").

and then discuss its specific application to this case.

    A.    <u>History, Purpose and Scope of the Speech or Debate Clause</u>.

The Speech or Debate Clause privilege is rooted in the epic struggle for parliamentary

supremacy in 16th and 17th century England:

> Behind these simple phrases lies a history of conflict between the
> Commons and the Tudor and Stuart monarchs during which
> successive monarchs utilized the criminal and civil law to suppress
> and intimidate critical legislators.

<u>U.S. v. Johnson</u>, 383 U.S. 169, 178 (1966).

> As Parliament achieved increasing independence from the Crown,
> its statement of the privilege grew stronger.  In 1523, Sir Thomas
> More could make only a tentative claim. . . . In 1668, after a long
> and bitter struggle, Parliament finally laid the ghost of Charles I,
> who had prosecuted Sir John Elliot and others for "seditious"
> speeches in Parliament. . . .  In 1689, the Bill of Rights declared in
> unequivocal language:  "That the Freedom of Speech, and Debates
> or Proceedings in Parliament, ought not to be impeached or
> questioned in any Court or Place out of Parliament."

<u>Tenney v. Brandhove</u>, 341 U.S. 367, 372 (1951).

As a result of the English experience, "[f]reedom of speech and action in the legislature

was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause

of the Constitution.  <u>Id</u>.  The Speech or Debate Clause was intended by the Founders

> to insure that the legislative function the Constitution allocates to
> Congress <u>may be performed independently</u>.
>    . . . .
> [T]he "central role" of the Clause is to "prevent intimidation of
> legislators by the Executive and accountability before a possibly
> hostile judiciary . . . ."

Eastland, 421 U.S. at 502 (emphasis added) (quoting Gravel, 408 U.S. at 617).[8]  "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." Johnson, 383 U.S. at 178.

"[T]he guarantees of th[e Speech or Debate] Clause are vitally important to our system of government and therefore are entitled to be treated by the courts with the sensitivity that such important values require." Helstoski v. Meanor, 442 U.S. 500, 506 (1979).  Accordingly, the Supreme Court has "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes." Eastland, 421 U.S. at 501.[9]

The Speech or Debate privilege, as it has been construed by the Supreme Court and the lower courts, has two broad aspects.  First, the clause provides immunity from lawsuits for all actions "within the 'legislative sphere,' . . . even though the [] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." McMillan, 412 U.S. at 312-13 (quoting Gravel, 408 U.S. at 624-25).  This legislative immunity extends to civil suits as well as criminal prosecutions.[10]

---

[8]   See also Eastland, 421 U.S. at 510 n.16 ("The speech or debate protection provides an absolute immunity from judicial interference."); U.S. v. Brewster, 408 U.S. 501, 507 (1972); Johnson, 383 U.S. at 178-82; Tenney, 341 U.S. at 373.

[9]   See also McMillan, 412 U.S. at 311; Gravel, 408 U.S. at 618; Johnson, 383 U.S. at 179; Kilbourn, 103 U.S. at 204.

[10]   Civil Suits:  Eastland, 421 U.S. 491 (dismissing suit to enjoin Senate committee investigation); McMillan, 412 U.S. 306 (dismissing as against House committee Members suit to enjoin preparation and publication of committee report); Dombrowski v. Eastland, 387 U.S. 82 (1967) (dismissing as against Senate committee Members civil conspiracy claim relating to their receipt of documents); Kilbourn, 103 U.S. 168 (dismissing trespass action against House Members).

Criminal Prosecutions: Johnson, 383 U.S. 169 (reversing conspiracy conviction based in part
(continued...)

Second, the Speech or Debate Clause provides a testimonial privilege.  <u>Gravel</u>, 408 U.S.

606.  This aspect of the privilege operates to protect those to whom it applies from being

compelled to give testimony as to privileged matters,[11] and from being compelled to produce

privileged documents.[12]

The Supreme Court has drawn no distinctions between the immunity from suit and the

testimonial aspects of the privilege.  Rather, it has stated unequivocally that when the Speech or

Debate privilege applies, it is "absolute."

> The question to be resolved is whether the actions of the petitioners
> fall within the "sphere of legitimate legislative activity."  If they do,
> the petitioners "shall not be questioned in any other Place" about
> those activities since <u>the prohibitions of the Speech or Debate
> Clause are absolute</u>.

---

[10](...continued)
on Speech or Debate evidence); <u>U.S. v. Helstoski</u>, 442 U.S. 477 (1979) (excluding evidence of
legislative acts in criminal prosecution of House Member); <u>Brewster</u>, 408 U.S. at 512 ("[A] Member
of Congress may be prosecuted under a criminal statute provided that the Government's case does
not rely on legislative acts or the motivation for legislative acts.").

[11]     <u>See, e.g.</u>, <u>Dennis v. Sparks</u>, 449 U.S. 24, 30 (1980) (dicta); <u>Gravel</u>, 408 U.S. at 615-
16; <u>Miller v. Transamerican Press, Inc.</u>, 709 F.2d 524, 528-29 (9th Cir. 1983) (denying motion to
compel testimony from former congressman).

[12]     <u>See, e.g.</u>, <u>Maddox v. Williams</u>, 855 F. Supp. 406, 413 (D.D.C. 1994), <u>aff'd sub nom.</u>
<u>Brown & Williamson Tobacco Corp. v. Williams</u>, 62 F.3d 408 (D.C. Cir. 1995); <u>Minpeco, S.A. v.
Conticommodity Services</u>, 844 F.2d 856, 859-61 (D.C. Cir. 1988) (quashing document subpoena to
congressional subcommittee); <u>McSurely v. McClellan</u>, 553 F.2d 1277, 1296-97 (D.C. Cir. 1976) (en
banc); <u>Dombrowski v. Burbank</u>, 358 F.2d 821, 823-24 (D.C. Cir. 1966) (dicta), <u>aff'd in part and rev'd
in part</u>, 387 U.S. 82 (1967); <u>Hearst v. Black</u>, 87 F.2d 68, 71-72 (D.C. Cir. 1936); <u>United
Transportation Union v. Springfield Terminal Ry. Co.</u>, 132 F.R.D. 4, 5-7 (D. Maine 1990) (quashing
document subpoena to Senator); <u>U.S. Football League v. National Football League</u>, 1986-1 Trade
Cas. (CCH) ¶ 67,123 (S.D.N.Y. 1986); <u>U.S. v. Peoples Temple of the Disciples of Christ</u>, 515 F.
Supp. 246, 248-49 (D.D.C. 1981) (quashing document subpoena to congressional committee).

Eastland, 421 U.S. at 501 (emphasis added).[13]

B.      Application of the Speech or Debate Clause to This Case.

As noted above, the Speech or Debate privilege applies to all activities of a Member of

Congress that are within the  "legislative sphere."  Activities within the legislative sphere include

more than words spoken in debate.  The cases "have plainly not taken a literalistic approach in

applying the privilege. . . . Committee reports, resolutions and the act of voting are equally

covered."  Gravel, 408 U.S. at 617.  Similarly, committee investigations and hearings have also

long been held to be activities within the legislative sphere.  See, e.g., Eastland, 421 U.S. 491.

The investigative staff reports addressing the SBIS program are clearly legislative in

nature.  They were prepared by Committee staffers at the request of the Subcommittee to assist

the Committee in carrying out its principal legislative responsibility, namely "reaching decisions

on specific funding levels" with respect to the SBIS program.  H.R. Rep. 104-870, at 12 (1996).

Accordingly, whether this case is viewed as the functional equivalent of a subpoena duces tecum,

or an attempt by plaintiffs to obtain the testimony of the investigative staff (in the form of the

written advice the staff provided to the Committee), it must fall under the testimonial privilege

prong of the Speech or Debate Clause.  See, e.g., Gravel, 408 U.S. at 618 (congressional aide

cannot be compelled to testify about legislative matters); Maddox v. Williams, 855 F. Supp. at

---

[13]     Eastland repeatedly reaffirmed the absoluteness of the privilege.  See 421 U.S. at 503
("The applicability of the Clause to private civil actions is supported by the absoluteness of the term
'shall not be questioned,' and the sweep of the term 'in any other Place.'"); id. at 507 ("[T]he Speech
or Debate Clause provides complete immunity for the Members . . . ."); id. at 509-10 ("[Respondents'
argument] ignores the absolute nature of the speech or debate protection and our cases which have
broadly construed that protection"); id. at 510 n.16 ("[B]alancing plays no part.  The speech or debate
protection provides an absolute immunity from judicial interference.").  See also Barr v. Matteo, 360
U.S. 564, 569 (1959) ("[T]he Constitution itself gives an absolute privilege to members of both
Houses of Congress in respect to any speech, debate, vote, report, or action done in session.").

413 ("[T]he Speech or Debate Clause stands as an insuperable obstacle to [a party's] attempt to acquire by compulsion documents or copies of documents in the possession of the Congress."), aff'd sub nom. Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408.  See also cases cited supra at note 12.

Just as clearly, the Subcommittee's decision not to make the investigative staff reports public constitutes a "legislative activity."  Accordingly, if the case is viewed as a challenge to the Subcommittee's decision not to release the documents, it also fails because the Committee and Chairman Livingston are immune from suit under the Speech or Debate Clause.  See cases cited supra at note 10.

For all these reasons, plaintiffs' claim against the Committee and Chairman Livingston is barred by the Speech or Debate Clause of the Constitution.

II.      Plaintiffs' Claim Is Barred by the Rulemaking and Journal Clauses of the
         Constitution Because the Documents Sought Are Deemed Confidential by House
         Rules.

The Rules of the House provide an independent basis for protecting from disclosure the records sought by plaintiffs here.

The House is authorized under the Rulemaking Clause of the Constitution to "determine the Rules of its Proceedings."  U.S. Const., art, I, § 5, cl. 2.  The Rulemaking Clause is "a broad grant of authority," Consumer's Union of the United States, Inc. v. Periodical Correspondent's Ass'n, 515 F.2d 1341, 1343 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976), that sits "[a]t the very core of our constitutional separation of powers."  Walker v. Jones, 733 F.2d 923, 938 (D.C. Cir.) (MacKinnon, J., concurring in part and dissenting in part), cert. denied, 469 U.S. 1036 (1984).

The Rulemaking Clause, coupled with the Journal Clause — U.S. Const., art. I, § 5, cl. 3 ("[e]ach House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy.") — clearly provides the House with the constitutional authority to keep its records confidential when it chooses.  As the Court of Appeals for this Circuit has held, "Congress has undoubted authority to keep its records secret, authority rooted in the Constitution, longstanding practice, and current Congressional rules." Goland v. CIA, 607 F.2d 339, 346 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980).

Here, the House exercised its constitutional authority to protect the confidentiality of information provided to the Committee by its investigative staff.  The House delegated to the Committee authority to adopt rules not inconsistent with the Rules of the House.  House Rule XI.2(a).  The Committee, in turn, adopted Section 8 which, as noted above, provides that "[a]ny information obtained by such [investigative] staff . . . shall not be released for publication until the subcommittee so determines."  The confidential nature of investigative staff reports is highlighted by the fact that — absent an affirmative decision of the subcommittee — they are not even available to Members of the Committee, other than the Chairman, the Ranking Minority Member, and the Members of the subcommittee for whom the information was prepared.[14]

In short, pursuant to an unquestionably valid exercise of its rulemaking powers, the

---

[14]    Section 8 is not, however, unique.  The House has, by rule, determined to keep other records confidential.  See, e.g., House Rule X.4(e)(2)(F) (requiring that information received by, and activities, reports and proceedings of, House Committee on Standards of Official Conduct be kept confidential); House Rule XXXVI (requiring that certain archived records be kept confidential for certain periods of time); Rule 22, Rules of the Committee on National Security (105th Cong.) (all classified information deemed to have been received in executive session); Rule 20, Rules of the Committee on International Relations (105th Cong.) (prohibiting divulgence to unauthorized persons of classified information).

House has given confidential treatment to the Committee documents at issue here.  Accordingly,

granting plaintiffs' claims would unconstitutionally intrude upon the rulemaking powers of the

House and, for this additional reason, the complaint must be dismissed.  U.S. v. Ballin, 144 U.S.

1, 5 (1892) (House Rules may not ignore constitutional restraints or violate fundamental rights,

but are otherwise "absolute and beyond the challenge of any other body or tribunal.").[15]

III.     This Court Is Not Bound By, and Should Not Follow, U.S. v. Schwartz.

The sole articulated basis for plaintiffs' claim is a supposed common law right of access

to public records.  Complaint at ¶ 23 (citing Schwartz v. U.S. Dept. of Justice, 435 F. Supp. 1203

(D.D.C. 1977)).  In a very brief opinion, the District Court in Schwartz — relying on U.S. v.

Mitchell, 551 F.2d 1252 (D.C. Cir. 1976), for the proposition that such a common law right was

generally recognized in this circuit — held that "Congress is subject to the common law rule

which guarantees the public a right to inspect and copy public records."  435 F. Supp. at 1204.

However, contrary to the suggestion in plaintiffs' Complaint, Schwartz was not affirmed

by the D.C. Circuit.  Moreover, Schwartz is a complete anomaly which this Court can and should

disregard.  To assist the Court in understanding why it should disregard Schwartz, we describe

what happened in that case in some detail.  The following discussion is based on pleadings filed

---

[15]     In In re Grand Jury, 821 F.2d 946, 958-59 (3rd Cir. 1987), cert. denied, 484 U.S. 1025
(1988), the Third Circuit held that "confidential deliberative communications" of state legislators
might be protected by a common law privilege analogous to the "deliberative process privilege"
applicable to executive branch officials.  The Third Circuit said this privilege would apply "to
confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice."
Id. at 959.  Were this Court to accede to plaintiffs' claim here, the effect would be to provide less
protection to confidential communications of Members of Congress (to whom the Speech or Debate,
Rulemaking and Journal Clauses of the Constitution apply) than to confidential communications of
state legislators (to whom none of those constitutional precepts apply).  We do not believe the Court
would intend, or should countenance, this result.

in the Schwartz case which we obtained from the National Records Center in Suitland, Maryland, and copies of which are attached collectively as Exhibit C.

Mr. Schwartz was a federal prison inmate, acting pro se, when he commenced a FOIA action in the District Court against the Department of Justice and Peter Rodino, then Chairman of the House Judiciary Committee.  Mr. Schwartz sought copies of documents related to alleged Justice Department and Judiciary Committee investigations of a federal prosecutor named Peter Schlam.  Action for Declaratory and Injunctive Relief (June 15, 1977).

Chairman Rodino, represented by the U.S. Attorney, initially moved to dismiss the complaint against him solely on the ground that Congress is exempt from FOIA.  Motion to Dismiss Defendant Peter A. Rodino, Jr. (July 11, 1977).  In response, Mr. Schwartz filed an affidavit in which he referred to U.S. v. Mitchell and asserted that he was suing Chairman Rodino under a common law right of access to public records.  Affidavit in Opposition (July 29, 1997).  Mr. Schwartz did not amend his complaint.  On behalf of Chairman Rodino, the U.S. Attorney then filed a short supplemental memorandum which argued only that the common law right of access was limited under Mitchell to certain judicial records.  Defendants' Supplemental Memorandum . . . in Support of Defendants' Motion to Dismiss (Aug. 11, 1977).  The U.S. Attorney did not assert any constitutional defenses to Mr. Schwartz's "new" claim, and did not note that the Supreme Court had already granted certiorari in Mitchell.[16]  In this procedural context, the District Court denied Chairman Rodino's motion to dismiss in the opinion reported at 435 F. Supp. 1203.  See Order (Aug. 30, 1977).

---

[16]     As discussed below, Mitchell was reversed by the Supreme Court in Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978).

Subsequently, Chairman Rodino moved for summary judgment on the ground that the Judiciary Committee had not investigated Peter Schlam and neither he nor the Judiciary Committee had any responsive documents. Motion to Dismiss or, in the Alternative, for Summary Judgment (Sept.30, 1977). Mr. Schwartz responded by questioning the absence of any records. Plaintiff's Opposition (Oct. 6, 1977). Shortly thereafter, Chairman Rodino discovered certain arguably responsive records, some of which he produced to Mr. Schwartz (including copies of newspaper clippings, Congressional Record excerpts, a federal criminal indictment, and other "public domain" documents), and others of which he withheld (including staff notes and internal memoranda). Supplement to Motion to Dismiss or, in the Alternative, for Summary Judgment (Dec. 7, 1977). The District Court then granted Chairman Rodino's motion for summary judgment on the ground that "all available records have been turned over to the plaintiff." Memorandum Order at 1 (Dec. 13, 1997).

After the claim against Chairman Rodino had been dismissed, the District Court also granted the Justice Department's motion for summary judgment on the remaining FOIA claim against the Department. Memorandum Order (Feb. 9, 1978). Mr. Schwartz then appealed this ruling — *and only this ruling* — and the D.C. Circuit affirmed on May 9, 1979. <u>See</u> Notice of Appeal (March 3, 1978); Appellant's Brief (July 18, 1978); Judgment (May 9, 1979) (affirming "on the basis of the Memorandum Order, filed February 9, 1978"). *There was no appeal from the District Court's August 30, 1977 published decision.*[17]

---

[17]    The Federal Reporter incorrectly reports that the Court of Appeals affirmed the District Court's August 30, 1977 decision which, as noted above, was published at 435 F. Supp. 1203. <u>See</u> <u>Schwartz v. U.S.</u>, 595 F.2d 888 (D.C. Cir. 1979) (unpublished table decision). We are taking steps to notify West Publishing and Lexis/Nexis of this error.

Against this backdrop, the Court should disregard the District Court's <u>Schwartz</u> opinion for the following reasons.

First, this Court need not follow <u>Schwartz</u> because that decision was not affirmed by the D.C. Circuit, contrary to the suggestion in plaintiffs' Complaint.  Complaint at ¶ 23.  As noted above, Mr. Schwartz only appealed, and the D.C. Circuit only affirmed, the District Court's February 7, 1979 ruling on the Justice Department's summary judgment motion.

Second, <u>Schwartz</u> was wrongly decided to the extent it purported to extend a common law right of access to Congressional documents that are protected from production by the Speech or Debate Clause and/or the Rulemaking and Journal Clauses of the Constitution.  As noted above, those constitutional defenses were not advanced, and therefore the <u>Schwartz</u> Court did not consider them, at the time it ruled that the common law rule applies to Congress.[18]

Third, in the more than 20 years since <u>Schwartz</u> was decided, no other court — within or without this circuit — has recognized a common law right of access to federal legislative records, has compelled the production of federal legislative records in reliance on such a common law right, or has cited or relied upon <u>Schwartz</u> in a case involving legislative records.

Finally, and perhaps most importantly, <u>Schwartz</u> is undercut by the Supreme Court's later decision in <u>Nixon v. Warner Communications</u> which reversed the D.C. Circuit's decision in <u>U.S. v. Mitchell</u>.  The documents at issue in that case were White House audiotapes that had been admitted as evidence in the Watergate trials and played in open court, and portions of which had

---

[18]    Although it is not entirely clear, the District Court's December 13, 1977 order can be read as accepting Chairman Rodino's argument that internal Judiciary Committee documents and files did not need to be produced.

been transcribed and published in the press.  Broadcasters requested court permission to copy and rebroadcast the tapes.  The D.C. Circuit held that broadcasters' common law right to the tapes outweighed any hypothetical risks to the Watergate defendants.  551 F.2d at 1261.  During the time this issue was before the courts, Congress passed the Presidential Recordings Act governing disclosure of Presidential audiotapes, but the D.C. Circuit did not examine in depth the application of the Act to the tapes or the Act's relationship to the common law right of access.

The Supreme Court assumed, without expressly so holding, that there is a common law right of access to public documents.  435 U.S. at 597-99.  However, it held that the existence of the Presidential Recordings Act made that common law right inapplicable to the White House audiotapes.  Id. at 607.  More broadly, the Court held that where "Congress has created an administrative procedure for processing and releasing [documents] to the public," that statutory scheme controls and the common law right of access does not apply.  Id. at 603.

This holding is directly applicable here because the House has established by rule a scheme for disclosing records and information to the public.  See, e.g., House Rules XI.2(e) (delineating type of information committees shall make public); XI.2(l) (requiring committees to file reports and other matters with House); XIII.2 (requiring committee reports to be delivered to, and printed by, Clerk); XXXVI (preservation and availability of non-current House records).  This rule-based scheme is the legal equivalent of other statutes that govern access to government records, such as the Presidential Recording Act and FOIA.[19]  And like the Presidential Recording

---

[19]     House Rules are judicially cognizable and have the force of law.  See, e.g., Yellin v. U.S., 374 U.S. 109, 114 (1963); Shape of Things to Come v. County of Kane, 588 F. Supp. 1192, 1993 (N.D. Ill. 1984); Randolph v. Willis, 220 F. Supp. 355, 358 (S.D. Cal. 1963).

Act in <u>Nixon</u>, the existence of these House rules renders the common law right of access

inapplicable here.

For all these reasons, plaintiffs have failed to state a claim.

IV.     Plaintiffs Are Not Entitled to the Investigative Staff Reports Because Those
        Documents Are Not "Public Records" and the Committee's Interest in Keeping the
        <u>Documents Confidential Outweighs the Public Interest in Disclosure.</u>

Finally, even if plaintiffs were correct that the common law doctrine applies to House

records, and even if the Court were to reject the constitutional defenses articulated above,

plaintiffs are still not entitled to the investigative staff reports.

The Court of Appeals for this circuit has recognized a general common law right of

access to public records in other contexts grounded in "the public's interest in keeping a

'watchful eye on the workings of public agencies.'" <u>U.S. v. El-Sayegh</u>, 131 F.3d 158, 161 (D.C.

Cir. 1997) (judicial records). <u>See also</u> <u>Washington Legal Foundation v. U.S. Sentencing</u>

<u>Commission</u>, 17 F.3d 1446, 1451-52 (D.C. Cir. 1994) (executive agency records).  This common

law right, however, is not absolute.  First, the right applies only to "public records." <u>Id</u>.  Second,

if the document sought is a "public record," then the court must "balance the government's

interest in keeping the document secret against the public's interest in disclosure." <u>Id.</u> at 1451-52.

Plaintiffs can surmount neither of these hurdles.

1.  "[A]s a matter of federal common law," this Circuit has defined "public record" as a

"government document created and kept for the purpose of memorializing or recording an

official action, decision, statement, or other matter of legal significance, broadly conceived."

<u>Washington Legal Foundation v. U.S. Sentencing Commission</u>, 89 F.3d 897, 905 (D.C. Cir.

1996).  A "public record," however, does "not encompass the preliminary materials upon which

an official relied in making a decision or other writings incidental to the decision itself." Id.  In

Washington Legal Foundation, for example, the plaintiff sought access to "internal documents

and memoranda" of the Advisory Working Group of the Sentencing Commission, which had

been established to "develop and recommend" sentencing guidelines to the Commission. Id. at

899.  The Court found that the documents sought  were not public records because they were

either "preliminary" or "merely incidental" to the official report written and made public by the

Advisory Group.[20]

        And so it is here.  Plaintiffs' claim fails because the investigative staff reports are not

"public records."  As discussed above, the responsibility of the Committee's investigative staff is

to conduct studies and examinations of matters within the Committee's jurisdiction in order to

assist the Committee in making legislative decisions about such matters.  Obviously, the

Committee can consider, rely on, ignore, or reject information provided to it by the investigative

staff to whatever extent the Committee chooses.  As such, the investigative staff reports are

clearly "preliminary or merely incidental to" the final decisions made by the Committee.  The

investigative staff reports are not final decisions themselves, nor  do they represent any official

action of the Committee.[21]

---

[20]    See also El-Sayegh, 131 F.3d at 162 (hallmark of a public record is that it
memorializes an official decision or final action of the governmental body; in holding that press had
no common law right to access to a rejected plea agreement, Court stated that common law right of
access "assumes a judicial decision.  If none occurs, documents are just documents; with nothing
judicial to record, there are no judicial records.").

[21]    Indeed, the Complaint itself appears to acknowledge as much in asserting that the
reports sought were "delivered" to Members of the Committee "for their consideration," Complaint
at 7, and were "relied" upon by the Committee in making decisions regarding the SBIS program.
Id. at ¶ 20.

2.  Even if the documents sought were deemed to be "public records," plaintiffs would still be unable to demonstrate that the public interest in disclosure outweighs the Committee's interest in non-disclosure.  Given the nature of the investigative staff's role in assisting the Committee, the type of information contained in the investigative staff reports, Section 8 of the Committee's Rules mandating confidentiality for such reports, and the lack of any clear benefit that would accrue to the public (or to plaintiffs for that matter) from the release of the reports, plaintiffs' "public interest" argument must fail as a matter of law.

For these reasons, plaintiffs have failed to state a claim upon which relief may be granted.

### Conclusion

For all the reasons given, defendants' Motion to Dismiss should be granted.

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and the Honorable Bob Livingston

March 16, 1998

<u>CERTIFICATE OF SERVICE</u>

I certify that on March 16, 1998, I served one copy of the foregoing Defendants' Motion

to Dismiss by first-class mail, postage prepaid, on:

Joel Z. Robinson, Esq.
Law Offices of Joel Z. Robinson & Co.
67 Wall Street
New York, NY 10005-3101

_____
Kerry W. Kircher



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PENTAGEN TECHNOLOGIES<br>INTERNATIONAL, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>COMMITTEE ON APPROPRIATIONS<br>OF THE U.S. HOUSE OF<br>REPRESENTATIVES, <u>et al.</u>,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. 1:98CV00047 (GK)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

MAR 1 7 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ERRATA**

On page 15 of the Motion to Dismiss filed on March 16, 1998, by defendants Committee

on Appropriations of the U.S. House of Representatives and Chairman Bob Livingston, the third

sentence (lines 5-6) incorrectly reads ". . . the District Court's February 7, 1979 ruling . . . ."  That

sentence should read ". . . the District Court's February 9, 1978 ruling . . . ."

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building

Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and Chairman Bob Livingston

March 17, 1998

CERTIFICATE OF SERVICE

I certify that on March 17, 1998, I served one copy of the foregoing Errata by first-class

mail, postage prepaid, on:

        Joel Z. Robinson, Esq.
        Law Offices of Joel Z. Robinson & Co.
        67 Wall Street
        New York, NY 10005-3101

                        Kerry W. Kircher



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
PENTAGEN TECHNOLOGIES               )
  INTERNATIONAL LTD., et al.,       )
                                    )
               Plaintiffs,          )
                                    )
       v.                           )   Case No. 1:98cv00047 (GK)
                                    )
COMMITTEE ON APPROPRIATIONS         )
  OF THE U.S. HOUSE OF              )
  REPRESENTATIVES, et al.,          )
                                    )
               Defendants.          )
                                    )
```

FILED

APR - 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**DEFENDANTS' REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

This case asks whether the House Committee on Appropriations ("Committee") can be

forced to release internal reports that are confidential under Committee rules and were prepared

by the Committee's investigative staff to assist it in carrying out its core legislative function of

deciding on appropriate funding levels for government programs.  The answer is clearly no

because (i) plaintiffs' claim is constitutionally barred by the Speech or Debate and the

Rulemaking and Journal Clauses of the Constitution; (ii) Schwartz v. U.S. Department of Justice,

435 F. Supp. 1203 (D.D.C. 1977), the sole basis for plaintiffs' supposed common law right of

access to congressional records is not good law; and (iii) in any event, the reports sought are not

"public records."  See Defendants' Motion to Dismiss (March 16, 1998).

Plaintiffs have filed an opposition to our motion which demonstrates convincingly that

their claim is baseless and should be dismissed immediately.  See Plaintiffs' Memo in Opposition

12

to Defendants' Motion to Dismiss (March 27, 1998) ("Opposition").  We now reply briefly to plaintiffs' arguments.

## Discussion

I.    The Speech or Debate Clause Most Assuredly Does Bar Plaintiffs' Claim.

We have already described the history, purpose and scope of the Speech or Debate Clause, and have explained why it bars plaintiffs' claim here.  Motion to Dismiss at 5-10.  Given the "absoluteness" of the Speech or Debate Clause privilege, Eastland v. United States Servicemen's Fund, 421 U.S. 491, 501, 503, 507, 509-10, 510 n.16 (1975), and its self-evident applicability to plaintiffs' suit against the Committee and Chairman Livingston, it is not surprising that plaintiffs' efforts to refute that constitutional defense fall woefully short of the mark.

Plaintiffs argue first that they are "not seek[ing] direct 'legislative' material."  Opposition at 3.  Whatever this means, it does not alter the fact that what they are seeking — internal staff reports designed to assist the Committee in carrying out its legislative responsibility to decide on funding levels for a Department of Defense program — is unquestionably "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation."  Eastland, 421 U.S. at 504.  As such, the reports are clearly legislative in nature and, therefore, protected from production by the Speech or Debate Clause privilege.  Motion to Dismiss at 9-10.

Plaintiffs also quote out of context language from U.S. v. American Telephone & Telegraph Co., 567 F.2d 121, 129 (D.C. Cir. 1977) — "the [Speech or Debate] Clause does not

and was not intended to immunize congressional investigatory actions from judicial review" —
for the proposition that the Speech or Debate Clause does not apply here.  Opposition at 4.
However, AT&T is not on point and only stands, at most, for the proposition that Congress may
not use the Speech or Debate Clause offensively to force compliance with a congressional
subpoena.

In that case, a congressional committee issued a subpoena to AT&T for phone records,
and the Justice Department sued AT&T (not the committee) to enjoin the company from
responding on the ground that compliance with the subpoena might harm the national security.
The committee, through its chairman, intervened to assert its interest in having AT&T comply
with the subpoena.  Each branch of the government claimed that its determination of the
propriety of its acts was conclusive on the Court.  In particular, the committee argued that
judicial interference with its subpoena was barred by the Speech or Debate Clause.  Id. at 128.

The Court rejected the committee's argument noting that the Speech or Debate Clause
was intended to protect legislators from executive and judicial interference, but did not prevent a
court from adjudicating a "challenge to congressional investigatory activity . . . raised as a
defense" (by, for example, the recipient of a congressional subpoena).  Id. at 129 (emphasis
added).  In the AT&T case, no one sought to question a member of Congress or compel the
production of documents from Congress, and the Court emphasized that

> no member of the Subcommittee . . . has been made a defendant in
> a judicial proceeding. . . . What the cases establish is that the
> immunity from judicial inquiry afforded by the Speech or Debate
> Clause is personal to members of Congress.  Where they are not
> harassed by personal suit against them, the clause cannot be
> invoked to immunize the congressional subpoena from judicial
> scrutiny.

Id. at 130.[1]

Here, obviously, the Committee and its chairman are not attempting to use the Speech or Debate Clause to force compliance with a congressional subpoena. Moreover, unlike in AT&T, the Committee and its chairman have been named as defendants and are asserting the constitutional privilege as a defensive bar to the claims asserted against them, exactly as it was intended to be used. Motion to Dismiss at 7-8.

II.    The Rulemaking and Journal Clauses Also Bar Plaintiffs' Claim.

We argued secondly that the Committee had chosen, by validly adopted rules, to keep confidential its investigative staff reports (such as those sought here), and that the Committee had the constitutional authority under the Rulemaking and Journal Clauses of the Constitution to do precisely that. Motion to Dismiss at 10-12.

Plaintiffs do not, because they cannot, dispute that the Committee's own rules permit it to decline to produce the records sought here. Instead, plaintiffs argue that the Rulemaking Clause "does not alter [sic] judicial responsibility to say what rules Congress cannot adopt because of constitutional infirmity." Opposition at 5. However, even if that statement is true, it is irrelevant. Plaintiffs have not asserted that the Committee has acted unconstitutionally or that its rules are unconstitutional.[2] Plaintiffs claim only that they have a common law right to inspect

---

[1]    Thus, for example, if a congressional committee sought enforcement of a congressional subpoena by means of a prosecution for contempt of Congress, the witness would be entitled to contest the validity of the subpoena and challenge the committee's jurisdiction, and the Speech or Debate Clause would not prevent the witness from defending himself by raising these issues. See, e.g., Barenblatt v. U.S., 360 U.S. 109 (1959); Watkins v. U.S., 354 U.S. 178 (1957).

[2]    We note that no Court in this nation's history has ever struck down a House rule of proceeding.

and copy Committee records, a right that, even if it did exist, would have to yield to the House's

constitutional authority to keep its records secret. Cf. Goland v. CIA, 607 F.2d 339, 346 (D.C.

Cir. 1978), cert. denied, 445 U.S. 927 (1980) ("Congress has undoubted authority to keep its

records secret, authority rooted in the Constitution, longstanding practice, and current

Congressional rules.").

Plaintiffs also suggest that Section 8 of the Committee's rules — which says that

investigative reports "shall not be released for publication until the subcommittee so determines"

— only prevents the Committee from "publishing" the reports, and does not speak to the issue of

"inspection and copying." Opposition at 5-7. This is silly. The intent of Section 8 is plain: to

prohibit investigative staff reports from being made public unless the Committee itself

affirmatively decides to make them public (as it has not so decided here). That certainly is how

the Committee construes the rule. In any event, even if the meaning of Section 8 were unclear,

that would not help plaintiffs because ambiguous congressional rules are non-justiciable:

> [T]he Rulemaking Clause of Article I clearly reserves to each
> House of the Congress the authority to make its own rules, and
> judicial interpretation of an ambiguous House Rule runs the risk of
> the court intruding into the sphere of influence reserved to the
> legislative branch under the Constitution. . . . Where . . . a court
> cannot be confident that its interpretation is correct, there is too
> great a chance that it will interpret the Rule differently than would
> the Congress itself; in that circumstance, the court would
> effectively be making the Rules--a power that the Rulemaking
> Clause reserves to each house alone.

U.S. v. Rostenkowski, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995).

III.   *Schwartz v. U.S. Dept. of Justice* Is Not a Sound Basis for Plaintiffs' Common Law
Claim.

We explained at some length in our motion that *Schwartz v. U.S. Dept. of Justice*, 435 F.

Supp. 1203 (D.D.C. 1977), the sole articulated basis for plaintiffs' claim, is not good law and

should not be followed by this Court.  Motion to Dismiss at 12-17.  Plaintiffs are unable to

acknowledge any of the flaws in that decision.

Plaintiffs first assert, remarkably, that *Schwartz* was "affirmed by the Court of Appeals."

Opposition at 7.  This is patently untrue, Motion to Dismiss at 12-14, regardless of what sorts of

intellectual contortions plaintiffs are prepared to engage in on this point.  The fact remains that

no party appealed the *Schwartz* Court's August 30, 1977 published decision, and the Court of

Appeals neither considered nor ruled on that decision.  *Schwartz*, therefore, is not binding on this

Court.[3]  See  *Brookens v. White*, 795 F.2d 178 (D.C. Cir. 1986) (appellant's failure to specify in

his notice of appeal a particular order "by name . . . or otherwise to evidence his intent to pursue

an appeal from that order, renders the notice [of appeal] inapplicable to th[at] order").[4]

Plaintiffs say secondly, citing the two *Washington Legal Foundation* cases, that the D.C.

Circuit subsequently approved the District Court's published opinion in *Schwartz*.  Opposition at

9-10.  This is also wrong.  The *Washington Legal Foundation* cases involved the applicability of

---

[3]      West Publishing has already corrected its electronic database to reflect (i) that the
Court of Appeals' decision in the *Schwartz* case, 595 F.2d 888 (D.C. Cir. 1979) (unpublished table
decision), only affirmed the District Court's unpublished February 9, 1978 order, and (ii) that there
was no appeal from the District Court's August 30, 1977 published decision.  See Attachment.
Lexis/Nexis has not yet corrected its database, but we expect that it will do so soon.

[4]      In the *Schwartz* case, not only did the plaintiff, Mr. Schwartz, not evidence an intent
to appeal from the District Court's August 30, 1977 published decision, he would have had no reason
to appeal that order since he had prevailed in that ruling.  Only Chairman Rodino would have had
reason to appeal  the August 30, 1977 published decision, and he obviously did not do so.

6

the common law right of access to the U.S. Sentencing Commission (an executive branch agency), not to Congress. Moreover, although both cases cited Schwartz, neither decision approved of Schwartz's holding that the common law right of access applies to Congress. In Washington Legal Foundation v. U.S. Sentencing Commission, 17 F.3d 1446, 1451 (D.C. Cir. 1994), the Court only cited Schwartz in connection with the unremarkable proposition that "the common law right extends only to 'public records,' not to every document contained in government files." In Washington Legal Foundation v. U.S. Sentencing Commission, 89 F.3d 897, 903 (D.C. Cir. 1996), the Court only mentioned Schwartz for the purpose of contrasting it with other cases that had recognized a common law right of access to judicial records. In short, the correctness of Schwartz's holding that a common law right of access applies to Congress was simply not an issue in the Washington Legal Foundation cases, and those decisions cannot be read as an endorsement of that holding.[5]

Finally, plaintiffs deny that the House rules that deal with the disclosure of records and information to the public render the common law right of access inapplicable to Congress because they are not like FOIA or the Presidential Records Act. Opposition at 11-12. While we acknowledge that the House rules are not identical to FOIA or the Presidential Records Act, they do constitute a scheme for disclosing records and information to the public that renders the common law right of access inapplicable to Congress under Nixon v. Warner Communications,

---

[5]     Plaintiffs point out correctly that both Washington Legal Foundation cases "noted that Schwartz had been affirmed." Opposition at 9. However, both decisions were obviously unaware that the Court of Appeals had not in fact affirmed the District Court's published opinion in Schwartz and, in all likelihood, they were simply reiterating erroneous information obtained from West Publishing or Lexis/Nexis.

Inc., 435 U.S. 589, 603 (1978).  While plaintiffs may not like that conclusion, their quarrel in this

regard is with the Supreme Court's holding, not with the Committee or its chairman.

IV.    The Staff Reports Are Not Public Records.

        We argued finally that even if plaintiffs were correct that the common law doctrine

applies to House  records, and even if the Court were to reject our constitutional defenses,

plaintiffs would still not be entitled to the investigative staff reports because they are not "public

records."  Motion to Dismiss at 17-19.  Plaintiffs dispute this conclusion on no less than six

meritless grounds.  Opposition at 13-17.

        First, attempting to quote Washington Legal Foundation, 89 F.3d at 905, plaintiffs say

that investigative staff reports are "government document[s] created and kept for the purpose of

memorializing [and recording] an official action, decision[,] statement[,] or other matter of legal

significance, broadly conceived."  Opposition at 13-14.  Plaintiffs base this conclusion largely on

the fact that the Surveys and Investigations Staff is a creature of statute and House rule.

However, plaintiffs miss the point.  The Surveys and Investigations Staff does not produce

reports of its own volition.  It only conducts studies and examinations, and then reports to the

Committee, when so requested by the Committee.  Motion to Dismiss at 3-4.  Furthermore, the

sole purpose of investigative staff reports is to assist the Committee in making appropriate

decisions about funding levels for government programs and operations, and those reports have

no independent legal significance.  As such, they clearly are not public records because they are

"preliminary materials" that are "incidental to" official decisions reached by the Committee and

the House itself.  Id. at 17-18.

Second, plaintiffs argue that the investigative staff reports are "public records" because they are prepared by persons of "competence and objectivity." Opposition at 14-15. This is irrelevant. While we agree that the members of the Surveys and Investigations Staff are both competent and objective, this has no bearing on whether the staff's written reports to the Committee are "public records."

Third, plaintiffs say that the reports they seek are "'final' reports, not merely 'working papers.'" Id. at 15. This is a semantic conclusion, unsupported by any legal analysis. Regardless of whether an investigative staff report is "final" in the sense that it is the end product of the staff's efforts, the point is that such a report lacks independent legal significance because it does not reflect the "final decision" of a governmental body — in this case the Committee and the House — with the authority to take official action.

Fourth, plaintiffs say the reports are public records because "there is no other mechanism for the release of the material sought." Id. This is, charitably, a lapse in logic. Obviously, plaintiffs have no preordained right to the investigative staff reports, and their lack of an alternative "mechanism" for obtaining access has no bearing on whether the reports are "public records" in the first instance.

Fifth, plaintiffs say defendants must be wrong because our "argument would result in any and all Congressional material being held to be non 'public record' . . ." Id. at 16 (emphasis omitted). This is incorrect. Under our analysis, many committee reports, House resolutions, and the like would constitute "public records" (assuming that the common law right of access

9

otherwise applied).[6]

Plaintiffs argue lastly that the Committee "has effectively acknowledged that the reports are 'public records' because it has already released some of the information contained in the Reports in question." Id. This is factually and legally inaccurate. The Committee, while referring to certain facts contained in the investigative staff reports, has never released the reports themselves. Moreover, the Committee's reference to those facts does not in any way constitute an "acknowledgment" that the reports are "public records." Indeed, the Committee has consistently taken the opposite position, both in this litigation and with plaintiffs informally prior to the initiation of this case. Finally, the Committee has the discretion under its own rules to release investigative staff reports in whole or in part. Motion to Dismiss at 4. Therefore, even if the Committee had released some information from an investigative staff report, that would not foreclose the Committee's right to decline to produce the remainder of the report.[7]

---

[6]     Needless to say, these kinds of documents are already available to the public.

[7]     Plaintiffs spend the last five pages of their brief arguing  that if the reports they seek were public records, their interest in disclosure would outweigh the Committee's interest in non-disclosure. Opposition at 17-21. This discussion is purely academic inasmuch as the reports are not public records, and plaintiffs are not otherwise entitled to review them. Moreover, the discussion greatly exaggerates plaintiffs' interest in obtaining the records, and ignores the Committee's interest in maintaining the confidentiality of the reports it receives from its investigative staff. See Motion to Dismiss at 4, 19.

10

## Conclusion

For all the reasons given above and in our Motion to Dismiss, the Motion to Dismiss should be granted.

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and the Honorable Bob Livingston

April 6, 1998

## CERTIFICATE OF SERVICE

I certify that on April 6, 1998, I served one copy of the foregoing Defendants' Reply to

Plaintiffs' Opposition to Defendants' Motion to Dismiss by first-class mail, postage prepaid, on:

> Joel Z. Robinson, Esq.
> Law Offices of Joel Z. Robinson & Co.
> 67 Wall Street
> New York, NY 10005-3101

Kerry W. Kircher

**Insta-Cite**                                                                  **Page 1**

Date of Printing: APR 06,1998

**INSTA-CITE**

CITATION: 435 F.Supp. 1203
=>            1 **Schwartz v. U. S. Dept. of Justice,** 435 F.Supp. 1203, 3 Media L. Rep. 1335
              (D.D.C., Aug 30, 1977) (NO. CIV. 76-2039)

**Secondary Sources**

**Corpus Juris Secundum (C.J.S.) References**
                76 C.J.S. Records Sec.62 Note 61
                76 C.J.S. Records Sec.62 Note 62

**FILED**

APR - 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

© Copyright West Group 1998

**Insta-Cite**                                                                 **Page 2**

Date of Printing: APR 06,1998

INSTA-CITE

CITATION: 595 F.2d 888

**Direct History**

1  Schwartz v. Department of Justice, 3 Media L. Rep. 1990 (D.D.C., Feb 09, 1978)
        (NO. 76-2039) (TEXT NOT AVAILABLE ON WESTLAW)
     Affirmed by
=> 2  **Schwartz v. U.S. Department of Justice,** 595 F.2d 888, 194 U.S.App.D.C. 81
        (D.C.Cir., Apr 05, 1979) (TABLE, NO. 78-1334)

FILED

APR - 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

© Copyright West Group 1998