UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DOUGLAS COX,

               Plaintiff,                          **MEMORANDUM AND ORDER**

          v.                              17-CV-3329 (RPK) (RLM)

DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF
THE DIRECTOR OF NATIONAL
INTELLIGENCE, and DEPARTMENT OF
STATE,

               Defendants.
-----------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

        Plaintiff Douglas Cox brings this suit under the Freedom of Information Act, 5 U.S.C.

§ 552 *et seq*., to compel five federal agencies to disclose a Senate report concerning the Central

Intelligence Agency's post-9/11 detention and interrogation program, as well as associated

documents.  The parties have now filed cross-motions for summary judgment, and Mr. Cox seeks

discovery.  For the reasons that follow, defendants' motion is granted, and Mr. Cox's motions are

denied.

## BACKGROUND

### I.    Factual Background

        The following facts are drawn from the parties' declarations, exhibits, and official

government records amenable to judicial notice.  *See Paskar v. City of New York*, 3 F. Supp. 3d

129, 134 (S.D.N.Y. 2014).

        In the days and weeks following the attacks of September 11, 2001, the Central Intelligence

Agency ("CIA") embarked on a covert detention and interrogation program to collect intelligence.

Press Release, Office of Senator Diane Feinstein (Apr. 3, 2014), Decl. of Vanna Blaine Ex. F (Dkt.

#60-2). Over the next eight years, the CIA detained over one hundred individuals at clandestine facilities, employing "enhanced interrogation techniques" to obtain information. *Ibid*. In January 2009, the government terminated the initiative. *Ibid*.

In March 2009, the Senate Select Committee on Intelligence ("SSCI" or the "Committee") launched an investigation of this program. Decl. of Neal Higgins ¶ 10, *in* Decl. of Vanna Blaine (Dkt. #60-2) ("Higgins Decl."). To facilitate the review, which would involve surveying millions of pages of CIA documents, the CIA and the SSCI negotiated terms of access for the SSCI's staffers. Higgins Decl. ¶ 11; Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 14, 2012), Decl. of Douglas Cox Ex. F (Dkt. #60-12) ("Dec. 14, 2012 Letter"). In a letter to the CIA's director, the SSCI "agree[d] that the Committee . . . w[ould] conduct the study of the CIA's detention and interrogation program" under certain "procedures and understandings." Letter from Sen. Dianne Feinstein to Director Leon Panetta (June 2, 2009), Blaine Decl. Ex. D ("June 2, 2009 Letter"). This letter established access protocols. The SSCI agreed to conduct its review at a CIA location on a CIA-provided computer network. *Ibid.*; *see* Higgins Decl. ¶ 11. The SSCI also agreed to certain redaction rules. June 2, 2009 Letter ¶ 9.

And especially relevant here, the June 2, 2009 letter stated that the SSCI's report would be the SSCI's property. In particular, the SSCI specified that "[a]ny documents generated on the network drive . . . as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee." June 2, 2009 Letter ¶ 6. These documents, the SSCI stated, would "remain congressional records in their entirety," with "disposition and control over these records, even after the completion of the Committee's review, l[ying] exclusively with the Committee." *Ibid*. "As such," the letter added, "these records are not CIA records under the Freedom of Information Act or any other law."

2

*Ibid.* "If the CIA receives any request or demand for access to those records from outside the CIA under the Freedom of Information Act or any other authority," the letter continued, "the CIA . . . will respond to the request or demand based upon the understanding that these are congressional, not CIA, records." *Ibid.*

Parameters established, the SSCI began its review. By December 2012, the Committee had completed a draft report, which the SSCI then circulated to members of the Executive Branch for comment. Dec. 14, 2012 Letter, at 1. After revisions, the SSCI approved the declassification and release of the report's Executive Summary and Findings and Conclusions in April 2014. Letter from Sen. Dianne Feinstein to President Barack Obama (Apr. 7, 2014), Decl. of Vanessa R. Brinkmann Ex. L (Dkt. #60-3) ("Apr. 7, 2014 Letter"). At the same time, Senator Feinstein, who was then the SSCI's Chair, transmitted the full report to the White House. The transmittal letter "encourag[ed] and approv[ed] the dissemination of the updated report to all relevant Executive Branch agencies." *Ibid*.

On December 9, 2014, the SSCI "formally filed the full version of its Study . . . with the Senate and publicly released the declassified Executive Summary and Findings and Conclusions." Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 10, 2014), Decl. of Vanessa R. Brinkmann Ex. M ("Dec. 10, 2014 Letter"). The SSCI also transmitted the final 6,963-page report to the White House. *See* Letter from Sen. Dianne Feinstein to President Barack Obama (Jan. 16, 2015), Decl. of Douglas Cox Ex. Z ("Jan. 16, 2015 Letter") (describing report length). The accompanying letter from Senator Feinstein stated that:

> the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

3

Dec. 10, 2014 Letter, at 1.

Senator Richard Burr then replaced Senator Feinstein as SSCI Chair. Letter from Sen. Richard Burr to President Barack Obama (Jan. 14, 2015), Decl. of Vanessa R. Brinkmann Ex. J (Dkt. #60-3) ("Jan. 14, 2015 Letter"); *see Committee Members 114th Congress (2015-2016)*, U.S. Sen. Select Comm. on Intel., https://www.intelligence.senate.gov/about/committee-members-114th-congress-2015-2016. On January 14, Senator Burr wrote to President Obama requesting the return of all copies of the report in the Executive Branch's possession. Jan. 14, 2015 Letter. In his letter, Senator Burr stated that he "consider[ed] the report to be a highly classified and committee sensitive document" that "should not be entered into any Executive Branch system of records." *Ibid*. Senator Feinstein replied with a letter of her own two days later disagreeing with Senator Burr's request. Jan. 16, 2015 Letter.

Over the next two years, Senator Feinstein wrote to various Executive Branch officials asking them to retain and read copies of the report. *See, e.g.*, Letter from Sen. Dianne Feinstein to Secretary of Defense Ashton B. Carter (Feb. 23, 2015), Decl. of Douglas Cox Ex. J (Dkt. #60-12); Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch (Jul. 14, 2015), Decl. of Douglas Cox Ex. K (Dkt. #60-12) ("Lynch Letter I"); Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch & Director James Comey (Nov. 5, 2015), Decl. of Douglas Cox Ex. L; Letter from Sens. Dianne Feinstein & Patrick Leahy to Archivist David S. Ferriero (Apr. 13, 2016), Decl. of Douglas Cox Ex. N ("Ferriero Letter").

On May 16, 2016, the D.C. Circuit determined that the SSCI report was a congressional record not subject to the Freedom of Information Act ("FOIA"). *ACLU v. CIA*, 823 F.3d 655, 667-68 (D.C. Cir. 2016).

After the D.C. Circuit's decision, Senator Feinstein continued to encourage Executive

Branch officials to designate the report as a federal record. Letter from Sen. Dianne Feinstein to Att'y Gen. Loretta Lynch (Nov. 21, 2016), Decl. of Douglas Cox Ex. O ("Lynch Letter II"). She also urged Attorney General Loretta Lynch and then Attorney General Jeff Sessions to "establish[] [the report] as . . . an agency record pursuant to the Freedom of Information Act." *Ibid*.; Letter from Sens. Dianne Feinstein, Mark R. Warner, Ron Wyden & Martin Heinrich to Att'y Gen. Jeff Sessions, at 2 (Mar. 9, 2017), Decl. of Douglas Cox Ex. P ("Sessions Letter"). Meanwhile, Senator Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report. Decl. of Eric F. Stein ¶ 12 (Dkt. #60-7) ("Stein Decl."); Email from Amanda J. Wall to Christina Sanford (May 31, 2017, 8:57 AM), Stein Decl. Ex. I ("Wall Email"). Some agencies did so. Letter from Gen. Counsel Bradley A. Booker to Sen. Richard Burr (June 1, 2017), Decl. of Douglas Cox Ex. Q (describing disposition of several copies); Decl. of Vanessa R. Brinkmann ¶ 13 (Federal Bureau of Investigation ("FBI") copy returned; Department of Justice ("DOJ") copy with U.S. district court); Decl. of Mark H. Herrington ¶¶ 6-7 (Dkt. #60-6) (Department of Defense ("DOD") copies retained); Stein Decl. ¶ 12 (Department of State ("State") copy returned).

## II. Procedural Background

On December 21, 2016, Mr. Cox submitted FOIA requests to five agencies: the DOJ, the FBI, DOD, the Office of the Director of National Intelligence ("ODNI"), and State. *See* Second Am. Compl. ¶¶ 45, 66, 81, 95, 107 (Dkt. #26). These requests sought the SSCI report, drafts the SSCI circulated with the agencies, text of the report excerpted or quoted in other agency records, and agency records detailing the report's transmission and handling. *Ibid*. Arguing that the report was a congressional record exempt from FOIA, the agencies declined to search for the report, drafts of the report, or excerpts or quotations from the report. *See* Mem. & Order 11-22, *Cox v. Dep't of Just.*, No. 17-CV-3329 (RRM) (RLM) (E.D.N.Y. Nov. 30, 2020) (Dkt. #53) ("Mem. & Order"). The agencies did produce records concerning the report's transmission and handling,

redacting these records pursuant to FOIA's enumerated exemptions. *Ibid*.

Seeking the withheld records, Mr. Cox filed this suit on June 2, 2017. Compl. ¶ 2 (Dkt. #1). Defendants moved to dismiss Mr. Cox's FOIA claims pertaining to the report, drafts, and quotations and moved for summary judgment on Mr. Cox's claims challenging the redactions to the produced documents. Notice of Mot. to Dismiss and for Summ. J. (Dkt. #52); Mem. & Order 23. On November 30, 2020, then-presiding Judge Roslynn R. Mauskopf granted defendants' motion in part and denied it in part. Mem. & Order 1.

Judge Mauskopf denied defendants' motion to dismiss Mr. Cox's requests for the SSCI report, drafts, and excerpts and quotations. *Id*. at 30. Adopting the D.C. Circuit's framework for determining whether a document qualifies as an "agency record" under FOIA, *id.* at 39 (citing *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013)), Judge Mauskopf nevertheless determined that she could not take judicial notice of defendants' evidentiary submissions on a motion to dismiss. *Id*. at 33. Therefore, she concluded that Mr. Cox's allegations as to the report's status precluded dismissal of his FOIA claims pertaining to the report, drafts, and quotations. *Id*. at 42.

Judge Mauskopf also granted in part and denied in part defendants' motion for summary judgment on Mr. Cox's FOIA claims challenging the withholding of information from the records the agencies did produce. *Id*. at 58-59. She determined that defendants adequately explained their redactions to all documents save those of the FBI. *Id.* at 53, 58. Therefore, she denied summary judgment as to the FBI documents, granted it as to the others, and invited defendants to renew their motion as to the FBI records after supplementing their submissions. *Id.* at 58-59.

Defendants now move for summary judgment on all of Mr. Cox's surviving FOIA claims. Notice of Second Mot. for Summ. J. (Dkt. #60). The remaining claims seek to vindicate Mr. Cox's

requests for copies and drafts of the final SSCI report held by the defendant agencies, as well as "portions [of these documents] that have been cut and pasted into, or quoted" elsewhere in defendants' records. DOJ FOIA Request (3), Second Am. Compl. Ex. D (Dkt. #26-4) ("DOJ FOIA Request"); *accord* DOJ FOIA Request (1)-(4); FBI FOIA Request (1)-(4), Second Am. Compl. Ex. E (Dkt. #26-5) ("FBI FOIA Request"); DOD FOIA Request (1)-(4), Second Am. Compl. Ex. F (Dkt. #26-6) ("DOD FOIA Request"); ODNI FOIA Request (1)-(3), Second Am. Compl. Ex. G (Dkt. #26-7) ("ODNI FOIA Request"); State FOIA Request (1)-(3), Second Am. Compl. Ex. H (Dkt. #26-8) ("State FOIA Request"); Second Am. Compl. ¶¶ 12-112. Mr. Cox's claim for FBI documents pertaining to the handling and transmission of the SSCI report also remains. FBI Request (5)-(6); Second Am. Compl. ¶¶ 60-72.

Mr. Cox has filed a cross-motion for summary judgment. Pl's Mem. in Opp'n & Cross-Mot. 1 (Dkt. #60-11) ("Pl.'s Mem. in Opp'n"). In the alternative, he seeks discovery under Federal Rule of Civil Procedure 56(d) and moves the Court to conduct an *in camera* review of one redacted FBI document, referred to as "Cox-30." *Id.* at 1 & 44.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quotations omitted). In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant. *See ibid*. A nonmoving party can survive summary judgment only if there is

sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

In assessing the record, I consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). I view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotations, alterations, and citation omitted).

Finally, *pro se* litigants typically enjoy special solicitude. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Since Mr. Cox is a practicing lawyer, though, *see* Mem. & Order 30, he is not entitled to this consideration. *Holtz v. Rockefeller & Co. Inc.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

## DISCUSSION

Defendants' motion for summary judgment is granted. The SSCI report, as well as drafts of and excerpts and quotations from that report are congressional records, not "agency records." Therefore, FOIA does not apply to these documents. Accordingly, defendants are entitled to summary judgment on Mr. Cox's requests for those materials under FOIA. In addition, since defendants have now adequately explained the redactions to the FBI records, defendants are also entitled to summary judgment on Mr. Cox's requests for materials that the FBI redacted. Mr. Cox's motion for discovery is denied as unmerited by the record, and the Court declines to conduct

an *in camera* review of Cox-30.

# I.     The Freedom of Information Act and Its Limits

Congress enacted FOIA in 1967 to "permit access to official information long shielded unnecessarily from public view." *EPA v. Mink*, 410 U.S. 73, 80 (1973), *superseded by statute on other grounds*.   Under its mandate, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  District courts, in turn, possess the power to "enjoin" agencies "from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

But FOIA strikes a "careful[] balance[]" between transparency and confidentiality. *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980).  First, Congress expressly limited FOIA's application to "*agency* records."   5 U.S.C. § 552(a)(4)(B) (emphasis added).  The records of other components of the federal government—including Congress—are excluded from FOIA's mandate.  *Id.* § 551(1)(A).  Such non-agency records need not be produced at all.  *Kissinger*, 445 U.S. at 150; *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 565-66 (2d Cir. 2016).

Second, Congress exempted nine specific categories of information within "agency records" from disclosure.  5 U.S.C. § 552(b).  The subjects these exemptions cover range from classified materials to federal-employee medical records.  5 U.S.C. §§ 552(b)(1)-(9).  When an exclusion applies, the agency typically must produce the document, but may redact exempted information.  5 U.S.C. § 552(b); *FBI v. Abramson*, 456 U.S. 615, 626 (1982).  The agency must justify any redactions it makes.  *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016).  Thus, while a litigant who seeks non-agency records will come away with nothing, a litigant who seeks "agency records" containing exempted information may still obtain a trove of documents, albeit in redacted

form.

## II.     Mr. Cox Is Not Entitled to the SSCI Report, Its Drafts, or Excerpts

Mr. Cox's first set of FOIA requests—for the SSCI report, its drafts, and excerpts—implicates FOIA's distinction between "agency records" and non-agency records. Mr. Cox argues that he is entitled to redacted copies of those materials because they have become "agency records" within the meaning of Section 552. But as the D.C. Circuit previously concluded, the SSCI report is a congressional record exempt from FOIA. So are drafts of, and excerpts from, that report. Accordingly, defendants are entitled to summary judgment on these requests.

### A.     The *Judicial Watch* test properly implements the statutory distinction between "agency records" and congressional records.

I adhere to Judge Mauskopf's ruling that the D.C. Circuit's test in *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013), should be used to decide whether the records in this case are "agency records" covered by FOIA. *See* Mem. & Order 39. That test determines whether a congressionally created document in the hands of an agency qualifies as an "agency record" based on (i) "the intent of the document's creator to retain or relinquish control over the records" and (ii) "the ability of the agency to use and dispose of the record as it sees fit." *Judicial Watch, Inc.*, 726 F.3d at 218; *id*. at 221. A document's status ultimately "turns on whether Congress manifested a clear intent to control the document." *Id.* at 221 (quotations omitted).

Typically, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Frommert v. Conkright*, 913 F.3d 101, 109 (2d Cir. 2019) (quoting *DiLaura v. Power Auth*., 982 F.2d 73, 76 (2d Cir. 1992)). I am not persuaded to depart from that practice here. The test developed by the D.C. Circuit and adopted by Judge Mauskopf properly accounts for separation-of-powers considerations. To be sure, as a general matter, "documents may qualify as 'agency records' if they (1) are created or obtained by

10

an agency, and (2) 'have come into the agency's possession in the legitimate conduct of its official duties.'" *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 76 (2d Cir. 2020) (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)). But when a FOIA request implicates "constitutional prerogative[s]," the doctrine of constitutional avoidance favors giving the term "agency record" a construction that would avoid impinging on those prerogatives. *Id*. at 77.

The *Judicial Watch* test appropriately applies that principle in interpreting the term "agency record" in the context of congressionally created documents. Mr. Cox seeks a sensitive report that Congress created to supervise Executive Branch activities. Attempts to discover this report implicate both Congress's "constitutional prerogative of maintaining secrecy" and its oversight function. *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978) (per curiam). As the D.C. Circuit explained, "Congress has undoubted authority to keep its records secret, authority rooted in the Constitution, longstanding practice, and current congressional rules." *Ibid.* But Congress also "exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress'[s] originating intent." *Ibid.* (citations omitted). If congressional documents were to become agency records whenever they came into an agency's lawful possession, Congress would be forced "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Ibid*.

The D.C. Circuit's approach in *Judicial Watch* gives effect to FOIA's disclosure mandate while protecting Congress's constitutional prerogatives. It allows for the possibility that materials originating with Congress may indeed become agency records subject to FOIA. *See ACLU v. CIA*, 823 F.3d at 661-65 (discussing the development and application of the test). But it permits Congress to safeguard the secrecy of confidential oversight documents that have been shared with

11

an agency but remain subject to continuing congressional control. Because the *Judicial Watch* test implements FOIA while giving due respect to constitutional prerogatives, I apply that test here.

### B.     FOIA does not extend to the SSCI report or to drafts of the report.

The draft and final versions of the SSCI report are not "agency records" subject to FOIA. To demonstrate that the documents in question are congressional documents—rather than agency documents—under the *Judicial Watch* test, defendants must show that (i) Congress intended "to retain . . . control over the records," and (ii) the defendant agencies lacked the ability to "use and dispose of the record[s]" as they "s[aw] fit." *ACLU v. CIA*, 105 F. Supp. 3d 35, 45 (D.D.C. 2015) (quoting *Judicial Watch, Inc.*, 726 F.3d at 218), *aff'd*, 823 F.3d 655 (D.C. Cir. 2016). As Judge Boasberg has explained, these "two factors represent two sides of the same coin." *Ibid.* "[An] agency—by definition—cannot lawfully 'control' . . . documents" once "Congress has manifested its own intent to retain control." *Ibid.* (quoting *Paisley v. CIA*, 712 F.2d 686, 693 (1983)). Conversely, once Congress has relinquished control, an agency may use the documents as it sees fit. *Ibid*. Therefore, the *Judicial Watch* inquiry may be put more succinctly as simply inquiring whether "sufficient indicia of congressional intent to control" exist. *Ibid.* (quoting *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004)). If they do, the document remains a congressional record.

An agency may show that Congress manifested its "intent to retain control over documents *either* when the documents [were] created *or* when the documents [were] transmitted to an agency." *ACLU v. CIA*, 823 F.3d at 664 (emphasis in original). The agency bears the burden of demonstrating that the materials are not agency records. *Doyle*, 959 F.3d at 76. Once Congress's intent to control the documents is established, though, that evidence can "only be overcome if the record reveals that Congress subsequently acted to vitiate the intent." *ACLU v. CIA*, 823 F.3d at 664.

Defendants have shown that the draft and final SSCI report are congressional documents, rather than agency records, under this test. When Congress began its investigation in 2009, it "manifested a clear intent" to control both draft and final versions of the SSCI report. *ACLU v. CIA*, 823 F.3d at 664 (quoting *Judicial Watch, Inc.*, 726 F.3d at 221)). The June 2, 2009 letter to the CIA outlining Congress's understanding of those documents unambiguously states that "[a]ny documents generated on the network drive" designated for use in creating the SSCI report, "as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee." June 2, 2009 Letter ¶ 6. The letter further specifies that "even after the completion of the Committee's review," these documents are to "remain congressional records." *Ibid*. And it specifies that requests for these documents are to be handled "based upon the understanding that these are congressional . . . records." *Ibid*. As the D.C. Circuit has explained, that language demonstrates the SSCI's intent to assert control over the SSCI report and its drafts. *ACLU v. CIA*, 823 F.3d at 664-65. The terms contain no expiration date. *See* June 2, 2009 Letter. And it permits limited disclosure within the Executive Branch only pursuant to "prior written authorization of the Committee." *Id.* ¶ 6. Clearer evidence of an "intent to control" these records is hard to imagine. *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc.*, 726 F.3d at 221).

Mr. Cox offers several arguments to explain away this letter, none of which are persuasive. First, Mr. Cox argues that the letter does not govern the SSCI's final report, but only SSCI work-product located in the CIA Reading Room. Pl.'s Mem. in Opp'n 32-37. This claim runs aground on the letter's plain language, which provides that it applies both to "[a]ny documents generated on the network drive" *and* to "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members." June 2, 2009 Letter. This

text "encompass[es] the Final Full Report, which by its own title is a 'final . . . report[] or other material[] generated by Committee staff or members.'" *ACLU v. CIA*, 105 F. Supp. 3d at 46 (quoting the June 2, 2009 Letter) (brackets omitted).

Mr. Cox also suggests that the letter ought to be read as part of an incomplete, unincorporated exchange and does not represent the final position of the SSCI. Pl.'s Mem. in Opp'n 37, 41. However, this claim lacks a basis in the record. While the CIA and SSCI exchanged other communications, none contradicted the intent Congress expressed in its June 2, 2009 letter. *See* Fax from the CIA to the SSCI (June 8, 2009), Decl. of Douglas Cox Ex. T ¶¶ 3, 5. In fact, the CIA's June 8 fax confirms Congress's control. In this fax, the CIA refers to the report as "your [i.e., the SSCI's] . . . report," and it asks whether "the SSCI plan[ed] to allow the CIA to review the SSCI final report before publication." *Id*. ¶ 3. While the fax discussed a "few issues" that were still to be sorted out between the CIA and SSCI, its language indicates that the matter of who controlled the final SSCI report had already been settled. *Id*. ¶ 1. Absent other evidence contradicting the understanding expressed in the June 2, 2009 letter or the June 8, 2009 fax, this argument is speculative, and it is not enough to preclude summary judgment.

Finally, Mr. Cox contends that the June 2, 2009 letter only applies to the CIA. But while the SSCI drafted the letter in the context of negotiations with the CIA, its language sweeps far more broadly. In the letter, the SSCI expressly states that the SSCI's "documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee." June 2, 2009 Letter ¶ 6. Such language cannot be read to limit the SSCI's assertion of control as against the CIA alone. In short, Congress "manifested a clear intent to control" the SSCI report and its drafts through its June 2009 letter. *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc*., 726

14

F.3d at 221).

Nor did Congress "subsequently act[] to vitiate" its control of the SSCI Report. *ACLU v. CIA.*, 823 F.3d at 664. On December 14, 2012, the SSCI transmitted a rough draft of the report to President Barack Obama to solicit "suggested edits or comments" from the Executive Branch. *See* Dec. 14, 2012 Letter, at 1. By stipulating that the SSCI would choose which edits to "accept[]" and "consider how to handle any public release of the report," the letter "undeniably reinforced what had already been made clear in the June 2009 Letter, *i.e.*, that the Committee intended to retain control over the Full Report." *ACLU v. CIA*, 823 F.3d at 667. On April 7, 2014, the SSCI transmitted a second version to the President, authorizing its dissemination to "relevant" agencies and explaining that the SSCI intended to release the report's Executive Summary and Findings and Conclusions publicly. Apr. 7, 2014 Letter, at 2. While this letter granted the President discretion in selecting which agencies ought to receive the report, the SSCI's decision to release portions of the report while limiting circulation of other portions underscored its continuing exercise of control.

Finally, on December 10, 2014, the SSCI sent President Obama a final version of the report. Dec. 10, 2014 Letter. In the accompanying letter, Senator Feinstein stated that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." *Id*. at 1. She encouraged the President to use "the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit." *Ibid.* Here again, Congress expanded the President's discretion over use of the report within the Executive Branch. Affording discretion, though, is not the same as surrendering control. Like the earlier letters, this letter gave congressional directions concerning the permissible uses of

15

the report, by specifying purposes for which the report was to be used and establishing or implying limits to the Executive Branch's ability to dispose of the document as it wished. Without more, these letters do not "vitiate the command of the June 2009 Letter." *ACLU v. CIA*, 823 F.3d at 667.

Mr. Cox also argues that Senator Feinstein's subsequent letters show that Congress abandoned control over the SSCI report. Pl.'s Mem. in Opp'n 25-29. However, the subsequent letters are not probative. After Senator Burr replaced Senator Feinstein as SSCI Chair in 2015, the two senators sent dueling missives to various agencies. *Compare* Jan. 14, 2015 Letter *and* Wall Email *with* Jan. 16, 2015 Letter, Lynch Letter I, Ferriero Letter, Lynch Letter II, *and* Sessions Letter. Describing the report "a highly classified and committee sensitive document," Senator Burr directed that it "should not be entered into any Executive Branch system of records." Jan. 14, 2015 Letter. Senator Feinstein and several others, meanwhile, urged Attorney General Jeff Sessions to "establish the [report] as an agency record pursuant to FOIA." Sessions Letter, at 2. Later, Senator Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report, again indicating that he continued to view the report as a congressional document. Stein Decl. ¶ 12; Wall Email. These contradictory letters do not offer a clear indication of subsequent congressional intent either to assert control over the report or to relinquish it after 2014.

By that same token, Mr. Cox's arguments concerning whether the White House established the report as a "presidential record" or the National Archives established it as a "federal record" are beside the point. Pl.'s Mem. in Opp'n 13, 15-19, 33; Pl.'s Reply 2, 7-8. Whether a document is a presidential record or federal record does not determine whether it is also an "agency record" under FOIA. *Compare* 44 U.S.C. §§ 2201, 2203 (presidential records) *and* 44 U.S.C. § 3303 *et seq.* (federal records) *with* 5 U.S.C. §§ 551, 552 (FOIA).

In sum, as the D.C. Circuit concluded, Congress asserted control over the SSCI report and its drafts in 2009. *ACLU v. CIA*, 823 F.3d at 667-68. The subsequent letters on which plaintiffs relied did not "vitiate the command of the June 2009 Letter." *Id.* at 663. As a result, neither the final SSCI report nor drafts of that report are agency records subject to FOIA.

### C. Mr. Cox is not entitled to excerpts or quotations of the SSCI report contained in agency records.

Since the sections of the SSCI report and its drafts that are quoted in agency documents also fall outside of FOIA, Mr. Cox's claims for "portions" of the report "that have been cut and pasted into, or quoted in," other agency documents are also denied. DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2). *Judicial Watch* looks to "manifest[ations]" of congressional intent, not the actions of agencies, in determining what qualifies as an "agency record." *ACLU v. CIA*, 823 F.3d at 663. Congress's intent to control a document is not affected by an agency's decision to quote or embed that congressional document within an agency report. Indeed, respect for congressional prerogatives dictates that even a portion of an agency-created document that merely reveals the content of a congressional document becomes a "congressional document[] not subject to FOIA." *United We Stand Am., Inc.*, 359 F.3d at 603. That conclusion comports with the principles of constitutional avoidance that underlie *Judicial Watch*. Permitting an agency to turn any congressional document into an agency record by copying it would hamper Congress's ability to engage in oversight while still maintaining control over its documents. Congress would be "forced either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Goland*, 607 F.2d at 346. As the D.C. Circuit has explained, constitutional avoidance counsels against a construction of the term "agency record" that would put Congress to such a choice.

*Doyle*, 959 F.3d at 77.  Accordingly, Mr. Cox is not entitled to portions of the draft or final SSCI report that are quoted in agency documents.

The same is true of the SSCI report copy that Mr. Cox alleges the DOD uploaded onto its network.  *See* Pl.'s Mem. in Opp'n 20.  Just as an agency cannot convert a portion of a congressional record into an agency record by copying it, neither can it convert it by copying the whole record.  The dispositive question remains Congress's intent to control a document it created, and as explained previously, the record indicates that Congress intended to control the report.  *See* pages 12-17, *supra*.

Finally, insofar as Mr. Cox recasts his FOIA inquiry as a request for agency records quoting the SSCI report rather than for the actual quotations themselves, *see* Second Am. Compl. ¶¶ 45, 66, 81, 95, 107; Pl.'s Mem. in Opp'n 38-40; Pl.'s Reply 3-4, Mr. Cox is not entitled to those materials in this lawsuit.  Mr. Cox's FOIA requests sought "portions of the *SSCI Report on Torture* that have been cut and pasted into, or quoted in," agency records, DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2), but did not seek agency records themselves.  Section 552 only authorizes district courts to order the production of agency records "improperly withheld."  5 U.S.C. § 552(a)(4)(B).  Since Mr. Cox never requested agency records containing these excerpts, the agencies cannot be said to have "improperly withheld" them.  *Ibid*.  Therefore, the Court lacks the power to compel their production.  *See Willis v. U.S. Dep't of Just.*, 581 F. Supp. 2d 57, 68 (D.D.C. 2008).

In sum, I grant defendants summary judgment on all of Mr. Cox's requests for the final report, its drafts, and excerpts.  These include Mr. Cox's DOJ requests (1)-(4), FBI requests (1)-(4), DOD requests (1)-(4), ODNI requests (1)-(3), and State requests (1)-(3).

III.     **Defendants Sufficiently Explain the Withholding of Information in the FBI Records**

Defendants are also entitled to summary judgment on Mr. Cox's challenge to the withholding of information in the requested FBI records.  Mr. Cox initially sought FBI records discussing copies of the SSCI report "previously in Department of Justice possession that were . . . disposed of" and records "regarding how the Department of Justice or . . . other entities should handle or treat copies" of the report.  FBI Requests (5)-(6).  In response, the FBI has produced 154 pages of documents.   The FBI and CIA redacted 144 pages pursuant to FOIA's statutory exemptions.  Seidel Decl. ¶ 17.

Mr. Cox did not contest the adequacy of the FBI's search.  *See* Pl.'s Mem. in Opp'n to Defs.' First Mot. for Summ. J. 24 (Dkt. #52-10) ("Pl.'s First Mem. in Opp'n").  And in response to defendants' first motion for summary judgment, Mr. Cox relinquished his opposition to their assertions of Exemptions 6, 7(C),[1] and 7(E).  *Id*. at 35; Pl.'s Sur-Reply 10 (Dkt. #52-37).  He also dropped his opposition to defendants' redactions pursuant to Exemption 3, except in Cox-30.  Pl.'s First Mem. in Opp'n 27.  However, Judge Mauskopf denied defendants summary judgment on Mr. Cox's fifth and sixth FBI requests because defendants did not explain their redactions pursuant to Exemptions 1 and 5 with sufficient specificity.  Mem. & Order 49 & 52.  Defendants supplemented their filings and also produced one more document, Cox-181.  They now move again for summary judgment.  Mr. Cox focuses his opposition to the redactions to Cox-30, and he does not contest the redactions to Cox-181.  *See* Pl.'s Mem. in Opp'n 42-43 & n.23.

---

[1] While Mr. Cox does not appear to have explicitly abandoned his challenge to the assertions of Exemption 7(C), Judge Mauskopf determined that he had, *see* Mem. & Order 27 ("[I]n his opposition and sur-reply, [Mr.] Cox withdr[e]w any challenges to the Agencies' withholdings pursuant to exemption[] . . . seven."), and Mr. Cox has not challenged her conclusion or renewed his opposition to the exemption's assertion.  Therefore, the Court "adhere[s] to" Judge Mauskopf's ruling and treats this challenge as abandoned.  *Vaughn v. Phoenix House N.Y. Inc*., 957 F.3d 141, 146-47 (2d Cir. 2020) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quotations omitted)).

Since Mr. Cox does not oppose the redactions to Cox-181, the Court grants defendants summary judgment on Cox-181 as unopposed. With their supplement filings, defendants also carry their burden on the remaining contested documents. Therefore, the Court grants defendants summary judgment on Mr. Cox's FBI requests (5) and (6) and declines to conduct an *in camera* review of Cox-30.

### A. The FBI and CIA now adequately explain the assertions of FOIA Exemptions 1, 3, and 5.

Mr. Cox's only remaining challenge is to the FBI's and CIA's withholding of FBI materials pursuant to FOIA Exemptions 1 and 5 and the withholding of information in Cox-30 pursuant to Exemption 3.

A court reviews an agency's decision to withhold information *de novo*. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). The agency bears the burden of justifying its withholding, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 174 (1991), and "[a]ll doubts are resolved in favor of disclosure," *Bloomberg, L.P. v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (brackets and quotations omitted). To meet its burden, an agency may produce "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption." *N.Y. Times v. CIA*, 965 F.3d 109, 114 (2d Cir. 2020) (quotations omitted). Such affidavits and declarations "are accorded a presumption of good faith," and if "reasonably detailed," "suffic[e] to sustain the agency's burden" at summary judgment. *Ibid.* (quotations omitted)

"[W]hen the information requested concerns national security," as it does here, "courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Ibid.* (quotations omitted; emphasis in original). "Ultimately, an

agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Ibid*. (quoting *Wilner v. NSA*, 592 F.3d 60, 75 (2009)).

### B.   Defendants adequately explain their assertions of of Exemption 5.

Applying these principles, the FBI and CIA have met their burden in explaining their application of Exemption 5 to the FBI materials.  Section 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption "withholds from a member of the public documents which a private party could not discover in litigation with the agency." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975)).  Included in this exemption is information that would be shielded by attorney-client privilege, *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002), and the deliberative-process privilege, *Klamath Water Users Protective Ass'n*, 532 U.S. at 8.

Attorney-client privilege "promote[s] open communication between attorneys and their clients so that fully informed legal advice may be given." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 360 (2d Cir. 2005) (quotations omitted).  It protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012) (quotations omitted).  However, while the privilege "protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance," it "may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L.*, 697 F.3d at 207 (quotations omitted).

21

The deliberative-process privilege protects those documents that "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8. Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," this privilege "enhance[s] the quality of agency decisions by protecting open and frank discussion among those who make them within the [g]overnment." *Id.* at 8-9 (internal quotations omitted). Documents qualify for this privilege if they are "both predecisional and deliberative." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (quotations omitted). "Generally, 'documents are predecisional if they were generated before the agency's final decision on a matter, and they are deliberative if they were prepared to help the agency formulate its position.'" *NRDC v. EPA*, 19 F.4th 177, 184 (2d Cir. 2021) (brackets omitted) (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021)). Predecisional documents are those created "to assist an agency decisionmaker in arriving at his decision." *ACLU v. NSA*, 925 F.3d 576, 592 (2d Cir. 2019) (quotations omitted). To determine whether a document is deliberative, the court examines "whether the document was prepared to help the agency formulate its position, by analyzing if it reflects the give-and-take of the consultative process." *NRDC v. EPA*, 19 F.4th at 184 (quotations omitted). The "key question" when evaluating assertions of the deliberative-process privilege is "whether disclosure would tend to diminish candor within an agency." *Id.* at 185 (quotations omitted).

The FBI and CIA have adequately explained the withholding of FBI records pursuant to Exemption 5. The FBI and CIA withheld information in twenty-four and twenty FBI documents respectively on the basis of this exemption. *See* Seidel Decl. ¶¶ 18, 19 & n.5; *id*. Ex. A ("FBI *Vaughn* Index"); Blaine Decl. Attachment A ("CIA *Vaughn* Index"). The FBI has categorized the

22

produced records into four categories: emails, letterhead memoranda, handwritten notes, and a white paper. Seidel Decl. ¶ 20. Its *Vaughn* index describes each document produced or withheld and the nature of the exempt information in each document. *Ibid*.; *see generally* FBI *Vaughn* Index. The Seidel Declaration also include a detailed explanation of the FBI's redactions pursuant to Exemption 5. Seidel Decl. ¶¶ 37-62.

The subject matter of the materials withheld under deliberative-process privilege ranges from "suggested language changes, redactions and classification recommendations" for the SSCI report, *id.* ¶ 47, to "how best to address important revisions to a sensitive program run by another intelligence agency," *id.* ¶ 59. The FBI also withheld information pursuant to the attorney-client privilege on a variety of matters—for example, advice on the legality of "the application of an investigative technique." *Id.* ¶ 44. These topics are related to each document in the *Vaughn* index. Through the Seidel Declaration and the FBI *Vaughn* index, the FBI has sufficiently explained its assertions of Exemption 5.

The same is true of the CIA's assertions of Exemption 5. The Blaine Declaration explains in detail the information withheld under this exemption. Under attorney-client privilege, the CIA withheld communications offering legal advice that the FBI had solicited. Blaine Decl. ¶ 33. The CIA also exempted, for example, information in "inter-agency communications related to the process by which the CIA and other Executive Branch agencies agreed to declassify certain national security information" in the SSCI report's Executive Summary, *id.* ¶ 34, as well as "requests and proposals for the distribution of the final report," *id.* ¶ 36. As the CIA explains, none of the withheld information reflects "final decisions." *Ibid.* Furthermore, the CIA describes the withholdings for each document in detail in its *Vaughn* index. *See generally* CIA *Vaughn* Index. This index can be cross-referenced with the disclosed documents, which are available as

an attachment to the Seidel Declaration. *See* Seidel Decl. Ex. B. Based on the declarations and the CIA's *Vaughn* index, the CIA has sufficiently explained its assertions of Exemption 5.

Mr. Cox only specifically challenges defendants' application of Exemption 5 to Cox-30, and these fall short. This document, an email chain with the subject line "RE: Hard Bound Copies of the SSCI Reports," contains redactions by both the FBI and CIA. *See* Cox-30, Seidel Decl. Ex. B ("Cox-30"). The FBI explains that it asserted Exemption 5 in connection with Cox-30 because that document contains "deliberations between FBI employees concerning the SSCI report, and communications between FBI employees discussing requests and proposals for distribution of the final report." FBI *Vaughn* Index. The FBI also explains that these deliberations "predate a final decision regarding the handling of the report" and do not reflect any "final decision[]." *Ibid*. Failure to protect these deliberations, the FBI warns, would "make FBI employees much more hesitant to provide their candid opinions when proposing actions or developing new FBI policies or procedures." *Ibid*. The CIA, for its part, asserts Exemption 5 to "protect pre-decisional and deliberative information regarding the handling of and access to the final SSCI report," squaring cleanly with the FBI's statement. CIA *Vaughn* Index.

These "reasonably detailed explanations" are "'logical [and] plausible.'" *N.Y. Times v. CIA*, 965 F.3d at 114 (quoting *Wilner*, 592 F.3d at 75)). The release of predecisional deliberations concerning the appropriate handling of a sensitive, highly classified report might well chill internal agency deliberations. Here, "whether disclosure would tend to diminish candor within an agency" is the "key question," and disclosing deliberations concerning how to handle a sensitive, highly classified report might well "diminish candor" in the future. *NRDC v. EPA*, 19 F.4th at 185 (internal quotations omitted).

Mr. Cox argues that the FBI's and CIA's explanations of their Exemption 5 redactions to Cox-30 conflict, since the CIA describes Cox-30 as discussing "inter-agency deliberations" whereas the FBI states that Cox-30 consists of emails between "FBI employees." Pl.'s Mem. in Opp'n 44-45 (emphasis omitted). He also suggests that the "brevity of this email exchange and the pedestrian nature of the subject line also raise questions about whether this could really constitute deliberative material." *Id.* at 45. These arguments lack merit. First, the CIA's and FBI's descriptions are not contradictory. To begin, the CIA—like the FBI—describes Cox-30 as "[e]mail between FBI employees." CIA *Vaughn* Index. Furthermore, it is entirely "plausible" and "logical," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted), that FBI employees might discuss "inter-agency deliberations" internally, and that the "distribution of the final report" might implicate "inter-agency deliberations," FBI *Vaughn* Index. And Mr. Cox's argument that the brevity of the exchange and its subject line raise doubts that it "could really constitute deliberative material" is entirely speculative. Pl.'s Mem. in Opp'n 45. Applying the presumption of good faith to which the agencies' declarations are entitled, *N.Y. Times v. CIA*, 965 F.3d at 114, the declarations sufficiently explain the agencies' assertions of Exemption 5.

### C. The agencies also adequately explain their assertions of Exemption 1.

Further, the agencies have adequately explained their assertions of Exemption 1.

Exemption 1 permits agencies to withhold records "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order No. 13,526 permits the classification of information pertaining to "intelligence sources or methods" or "foreign relations or foreign activities of the United States" when an "original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec.

Order No. 13,526 §§ 1.1(a)(3)-(4), 1.4(c)-(d), 75 Fed. Reg. 707, 707, 709 (Dec. 29, 2009).  Since information classified pursuant to Exemption 1 "concerns national security," the Court "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record."  *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted; emphasis in original).

The FBI and CIA withheld information in nineteen documents pursuant to Exemption 1. *See* Seidel Decl. ¶¶ 26, 33; FBI *Vaughn* Index; CIA *Vaughn* Index.  The agencies' declarants, FBI Section Chief Michael G. Seidel and CIA Officer Vanna Blaine, are original classification authorities under Executive Order 13,526.  Seidel Decl. ¶ 2; Blaine Decl. ¶ 3.  Both officers reviewed the exempted information and determined that it was appropriately classified pursuant to the executive order.  Seidel Decl. ¶¶ 24-25; Blaine Decl. ¶ 13.  The subject matter of the FBI redactions includes topics ranging from the FBI's "intelligence methods" to information that could identify the "target of foreign counterintelligence/espionage investigation."  Seidel ¶¶ 26, 30.  The FBI's *Vaughn* index identifies the information withheld in each document.  FBI *Vaughn* Index. The FBI has met its burden with respect to its assertions of Exemption 1, because it has offered "reasonably detailed explanations" of why the withheld information "fall[s] within an exemption." *N.Y. Times v. CIA*, 965 F.3d at 114.

So has the CIA.  As the Blaine Declaration explains, "[a]ll classified information for which the CIA has asserted Exemption (b)(1) constitutes intelligence sources and methods information." Blaine Decl. ¶ 14.  FBI documents that the CIA redacted "contain the names of CIA personnel associated with the CIA's former detention and interrogation program," the location of field installations, codewords, and information about intelligence sources, methods, and activities.  *Id.* ¶ 18; *see id.* ¶ 18-31.  The CIA's *Vaughn* index, in turn, identifies the information withheld in each

document with reasonable specificity. CIA *Vaughn* Index. In sum, the CIA's submissions offer "plausible" and "logical" explanations of its assertions of the exemption. *N.Y. Times v. CIA*, 965 F.3d at 114.

Mr. Cox again focuses his opposition on Cox-30 alone. Pl.'s Mem. in Opp'n 42-43. The FBI makes no Exemption 1 redactions to this document. The CIA redacts one paragraph, explaining that it did so:

> to protect classified intelligence activities, sources and methods, and classified foreign activities of the CIA—includ[ing] category (i) information regarding personnel associated with the review of the former detention and interrogation program; and category (iii) information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques.

CIA *Vaughn* Index. This explanation is both "plausible" and "logical," as emails concerning the report might include information about the CIA's foreign intelligence activities. *N.Y. Times v. CIA*, 965 F.3d at 114. Furthermore, these claims are entitled to a presumption of good faith, *Grand Cent. P'ship, Inc.*, 166 F.3d at 489, and given the subject matter, must be accorded "substantial weight," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations and emphasis omitted). Accordingly, this description adequately justifies the CIA's redaction of the single paragraph in Cox-30.

Mr. Cox presents no persuasive arguments to the contrary. Mr. Cox first argues that the "inculpatory nature" of the SSCI report "creates an incentive for [d]efendants to conceal its contents," and so the agencies' assertions that materials are classified should be "approach[ed] . . . with caution." *Id.* at 42. But an agency's declarations are entitled to a presumption of good faith, rebuttable only when contradicted by evidence on the record or by a showing of bad faith. *See N.Y. Times v. CIA*, 965 F.3d at 114; *accord Wilner*, 592 F.3d at 69; *Grand Cent. P'ship, Inc.*, 166 F.3d at 489. The subject matter of the disclosures is not grounds for abandoning the presumption,

and Mr. Cox has not identified evidence contradicting the agencies' assertions or showing bad faith in this litigation.

Mr. Cox also asserts that it is "implausible" that an "exceedingly brief email exchange" could contain "information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques" of the CIA. Pl.'s Mem. in Opp'n 43. But based on its subject line, this email thread discusses copies of the SSCI report, which itself details the CIA's intelligence activities. Given the topic of this email thread, it seems entirely plausible that the FBI employees might have referred to the contents of the report, and that the report's contents included "information pertaining to specific intelligence activities . . . including counterterrorism techniques." CIA *Vaughn* Index.

Finally, based on the subject line and timing of the email, Mr. Cox suggests that the CIA invoked the exemption to conceal misstatements to the D.C. Circuit. "[I]f," Mr. Cox states, Cox-30 "were, for example, discussing FBI's use of CIA copies" of the SSCI report, it "could" mean that a declaration filed by the DOJ in litigation was "technically true, but grossly misleading." Pl.'s Mem. in Opp'n 44. These claims are entirely speculative, and the Court "cannot base [its] judgment on mere speculation." *Wilner*, 592 F.3d at 75. Absent evidence of bad faith, the CIA is entitled to a presumption of good faith in its representations. *Id.* at 69 (citation omitted).

Accordingly, I conclude that defendants have also met their burden as to Exemption 1.

### D.     The Court does not reach the CIA's assertion of Exemption 3 for Cox-30.

Because Exemption 1 and Exemption 5 adequately support all of the CIA's redactions to Cox-30, the Court need not address Mr. Cox's objections to the CIA's assertion of Exemption 3 as an additional ground for certain redactions. "[E]xemptions 1 and 3 are separate and independent grounds" to justify withholding information, *Wilner*, 592 F.3d at 72, and "courts may uphold agency action under one exemption without considering the applicability of the other," *ibid*.

(quoting *Larson v. Dep't of State*, 565 F.3d 857, 862-63(D.C. Cir. 2009)).  Since the CIA has adequately justified its redactions to Cox-30 based on Exemption 1, the Court need not address the agency's assertion of Exemption 3.

> **E.    Mr. Cox's request for *in camera* review is denied.**

Mr. Cox's request for an *in camera* review of Cox-30 is denied.  The Second Circuit has adopted a "restrained approach" to such review, *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999), directing that "[a] court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs," *Wilner*, 592 F.3d at 75-76.  "When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate." *Rutigliano v. U.S. Dep't of Just.*, 847 F. App'x 86, 87 (2d Cir. 2021) (quoting *Larson*, 565 F.3d at 870) (summary order).  Since the defendant agencies have adequately explained their redactions to Cox-30, *see* pages 20-29, *supra*, an *in camera* review of that document would not be "appropriate," *Rutigliano*, 847 F. App'x at 87.

## IV.    Mr. Cox's Motion for Discovery Is Denied

Finally, Mr. Cox's motion for discovery is denied.  In the context of FOIA, discovery is rarely warranted.  *See, e.g.*, *Immerso v. U.S. Dep't of Lab.*, No. 19-CV-3777 (NGG) (VMS), 2020 WL 8996744, at *3 (E.D.N.Y. Mar. 2, 2020); *Est. of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-CV-7902 (RLE), 2016 WL 94140, at *3 (S.D.N.Y. Jan. 7, 2016); *N.Y. Times Co. v. U.S. Dep't of the Treasury*, No. 15-CV-5740 (ER), 2016 WL 4147223, at *5 (S.D.N.Y. Aug. 2, 2016) (citing *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011)).  To obtain discovery where, as here, the defendant agencies' submissions "are adequate on their face," Mr. Cox "must make a showing of bad faith on the part of the agency sufficient to impugn the agenc[ies'] affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agenc[ies]

should not apply or summary judgment is otherwise inappropriate." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994) (citations omitted).

Mr. Cox makes no such showing. He identifies neither "contrary evidence," nor representations or actions or statements "suggestive of bad faith." *Halpern*, 181 F.3d at 292. Instead, his argument turns entirely on the idea that "[d]efendants' heavily-lawyered declarations and cherry-picked documents" are insufficient to support summary judgment. Pl.'s Mem. in Opp'n 41. Rhetoric aside, Mr. Cox has the law backward. FOIA cases are "most appropriately resolved on motions for summary judgment" using precisely these sorts of documents, *not* through discovery. *Robbins Geller Rudman & Dowd LLP v. U.S. Sec. & Exch. Comm'n*, 419 F. Supp. 3d 523, 530 (E.D.N.Y. 2019) (quoting *Platsky v. Food & Drug Admin*., No. 13-CV-6250 (SLT) (RLM), 2014 WL 7391611, at *3 (E.D.N.Y. Dec. 24, 2014), *aff'd* 642 Fed. Appx. 63 (2d Cir. 2016), *as amended* (Jun. 21, 2016)). Without more than "purely speculative claims," Mr. Cox is not entitled to discovery. *Grand Cent. P'ship, Inc.*, 166 F.3d at 489 (quotations omitted).

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. Mr. Cox's request for *in camera* review and his motion for discovery under Rule 56(d) are also denied. The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: March 30, 2022
      Brooklyn, New York